COMMONWEALTH *vs.* CHARLES IANNELLO & another.

Suffolk.   April 2, 1962. — July 10, 1962.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & SPIEGEL, JJ.

*Larceny. False Pretences. Public Works. Commonwealth,* Financial matters. *Husband and Wife,* Criminal responsibility. *Pleading, Criminal,* Indictment, Bill of particulars. *Practice, Criminal,* Trial of indictments together.

An indictment alleging that the defendant "did steal money" of a certain amount from the Commonwealth was, under G. L. c. 277, §§ 41, 79, sufficient to charge larceny by false pretences.   [726]

Particulars furnished by the Commonwealth in a criminal case commenced by a sufficient indictment in the statutory form, although they bound the Commonwealth as to the scope of the indictment and the proof, could not render the indictment *insufficient.*   [726–727]

---

[1] There is an unsubstantial variation in the first sentence.

No abuse of discretion appeared in refusing to order tried separately, as sought by the defendants, and in consolidating for trial, as sought by the Commonwealth, a number of criminal cases involving alleged larceny from the Commonwealth in connection with sidewalk repair projects in a certain area.   [727–728]

Conviction of a contractor of larceny by false pretences from the Commonwealth was warranted by evidence supporting findings that the defendant, having obtained a contract with the Commonwealth for sidewalk repairs and having performed none or only a part of the work, submitted an invoice for payment in which, knowingly and with intent to defraud, he falsely certified full performance of the work, that the invoice was processed and paid in the usual manner, and that, in the light of the processing procedures, the Commonwealth in paying the invoice relied on the defendant's certification and not solely on its own representatives' inspections and approvals.   [734–738]

Evidence of the circumstances in which a wife's name was used by her husband in conducting a contracting business and in obtaining a payment from the Commonwealth by false pretences in connection with a sidewalk repair job, for which he was warrantably convicted of larceny, did not warrant a conviction of the wife also.   [738–739]

INDICTMENT found and returned on October 27, 1960.

A motion by the Commonwealth to consolidate the indictment with other indictments for trial was allowed, and a motion by the defendants for a severance was denied, by *Meagher, J.* A motion to quash the indictment was denied by *Quirico, J.,* and the indictment was tried before him.

*Thomas E. Dwyer (Joseph Graglia* with him) for the defendants.

*Joseph T. Doyle,* Assistant Attorney General (*Theodore R. Stanley,* Assistant Attorney General, with him), for the Commonwealth.

KIRK, J.   The defendants, Charles and Dorothy Iannello, husband and wife, were found guilty by a jury on an indictment (numbered 767) which was one of fifteen indictments charging them as codefendants with stealing from the Commonwealth of Massachusetts.  The case, made subject to G. L. c. 278, §§ 33A–33G, comes to us upon appeal accompanied by five assignments of error.[1]   It is contended by the defendants that the judge committed error in: (1) al-

[1] Other assignments of error, not having been argued, are deemed waived under Rule 13 of the Rules for the Regulation of Practice before the Full Court (1952), 328 Mass. 698.

lowing the Commonwealth's motion that all indictments be consolidated for trial; (2) denying the defendants' motion for a severance and for a separate trial on each indictment; (3) denying the defendants' motion to quash the indictment; (4) denying the defendants' motions for directed verdicts; and (5) denying the defendants' motion to set aside the verdicts of guilty.

We first consider assignment 3 which states that the judge was in error in denying the defendants' motion to quash the indictment. The motion was based on the ground that the indictment, together with the bill of particulars filed by the Commonwealth, did not state a crime cognizable under the laws of our Commonwealth. The indictment[2] was in statutory form. The judge, at the defendants' request, ordered the Commonwealth to furnish particulars including the following: "1. The exact time when the offense is alleged to have been committed." "3. The manner and means in and by which the said offense is alleged to have been committed." "5. The exact nature as to the crime which they are alleged to have committed." The particulars filed in answer thereto were, respectively, as follows: "1. That a written proposal dated March 13, 1958, was submitted by the defendants to reconstruct approximately 1520 square feet of damaged concrete walks from 137 to approximately 145 Gallivan Boulevard, in the Dorchester District of Boston; that an invoice dated June 5, 1958, was submitted in connection with said proposal; that a draft dated June 23, 1958, was issued by the Commonwealth in connection with said invoice; and that said draft bears a bank stamp dated June 25, 1958." "3. Proposal by the defendants to reconstruct approximately 1520 square feet of damaged concrete walks from 137 to approximately 145 Gallivan Boulevard, in the Dorchester District of Bos-

---

[2] In pertinent part the indictment reads: "that Charles Iannello and Dorothy Iannello on the twenty-third day of June in the year of our Lord one thousand nine hundred and fifty-eight, did steal money of the amount and of the value in all of nine hundred eighty-three dollars and six cents of the property of The Commonwealth of Massachusetts, a free, sovereign and independent body politic."

ton, and their failure to do so." "5. Larceny by false pretenses."

The gist of the defendants' contention as to assignment 3 is that the sufficiency of the indictment may be measured by the particulars which purport to state the nature of the crime and the manner and means of its commission and that, thus measured, the crime of larceny by false pretenses is not alleged.

This contention cannot prevail. The language of the indictment is that prescribed by G. L. c. 277, § 41, and G. L. c. 277, § 79. By both sections the language here used is declared sufficient.[3] *Commonwealth* v. *Farmer,* 218 Mass. 507, 509. See *Commonwealth* v. *Galvin,* 323 Mass. 205, 210–211. The purpose and effect of specifications in a bill of particulars have been frequently stated, although in somewhat varying language. The purpose is to give a defendant reasonable knowledge of the nature and character of the crime charged (*Commonwealth* v. *Hayes,* 311 Mass. 21, 24–25; *Commonwealth* v. *Ries,* 337 Mass. 565, 580–581), and the effect, when filed, is to bind and restrict the Commonwealth as to the scope of the indictment and to the proof to be offered in support of it. *Commonwealth* v. *Gedzium,* 259 Mass. 453, 457–458. *Commonwealth* v. *Snyder,* 282 Mass. 401, 412. *Commonwealth* v. *Albert,* 307 Mass. 239, 243. The specifications in a bill of particulars furnished by the Commonwealth in a criminal case do not, however, have the effect of derogating from an indictment which sufficiently avers a crime cognizable under our law. To yield to the defendants' contention would require us to disregard the plain language of the statute and would again expose the prosecution to the pitfalls of pleading which these sections, authorizing the short form indictment, were

---

[3] General Laws c. 277, § 41, provides: "In an indictment for criminal dealing with personal property with intent to steal, an allegation that the defendant stole said property *shall be sufficient;* and such indictment may be supported by proof that the defendant committed larceny of the property, or embezzled it, or obtained it by false pretenses" (emphasis supplied). General Laws c. 277, § 79, provides: "the forms . . . annexed [to this chapter] . . . shall be sufficient . . . . Larceny. (Under Chap. 266, § 30.) — (1) That A. B. did steal one horse of the value of more (*or less, as the case may be*) than one hundred dollars, of the property of C. D."

designed to eliminate. There was no error in the denial of the defendants' motion to quash.

We next consider assignments 1 and 2, relating to the consolidation of the indictments for trial. In all, twenty indictments were originally involved. In nineteen of these Iannello[4] was charged with larceny. In fifteen of the nineteen his wife was a codefendant. In the remaining four, his married daughter was a codefendant. The twentieth indictment charged Iannello and his wife and others with conspiracy to commit larceny. It is clear that there was an issue of fact, common to all of these indictments, which was presented for determination, namely, whether there was a failure by the defendants to perform sidewalk repair work in the metropolitan area between 1957 and 1960 which the defendant Iannello certified as having been done and for which payment had been made by the Commonwealth. Furthermore, the alleged victim of the larceny in all of the indictments was the same (the Commonwealth of Massachusetts). It is firmly established that in these circumstances the defendants could not insist as of right that they be tried separately on each indictment charging larceny. The determination in such a case as to whether the defendants' or the Commonwealth's substantial rights will be prejudiced by consolidation or severance for trial rests in the sound discretion of the judge. In *Commonwealth* v. *Mullen,* 150 Mass. 394, 397, this court, citing earlier cases, said: ''It has long been the practice in this Commonwealth to charge a defendant with various and distinct felonies in different counts of the same indictment, when they are of the same general nature and supported by similar evidence, and where the punishments to be awarded are of the same character. It is deemed that a defendant is sufficiently protected by the power which exists in the court to order separate trials upon the different counts, where there is, in its opinion, danger that a prisoner may be embarrassed in his defence. It is well settled that this rule has not been al-

---

[4] Whenever the word ''defendant'' or ''Iannello'' is hereafter used, reference is to Charles Iannello.

tered by the St. of 1861, c. 181 (Pub. Sts. c. 213, § 18)."[5]
This principle has been reiterated and applied in numerous
cases and in various situations including, as here, the trial
together of several indictments charging different crimes
arising out of a single chain of circumstances.   The follow-
ing are examples.   *Commonwealth* v. *Rosenthal,* 211 Mass.
50, 54.   *Commonwealth* v. *Slavski,* 245 Mass. 405, 411–412.
*Commonwealth* v. *D'Amico,* 254 Mass. 512, 514.   *Common-
wealth* v. *Gallo,* 275 Mass. 320, 324.   *Commonwealth* v.
*DiStasio,* 294 Mass. 273, 279.   *Commonwealth* v. *Sheppard,*
313 Mass. 590, 595.   Cf. *Commonwealth* v. *Ries,* 337 Mass.
565, 570, and cases cited.   We have reviewed the conten-
tions made by the Commonwealth and the defendants at the
hearing on the motions to consolidate and to sever and find
no basis for ruling that the order of the judge was an abuse
of discretion.

The remaining assignments of error, 4 and 5, relate to
the denial of the defendants' motions for directed verdicts
and to the denial of their motion that the verdicts be set
aside because they were against the weight of the evidence.
Consideration of these assignments of error requires that
we summarize from the more than one thousand pages
of the transcript the evidence relating to the substantive
offences.

The Metropolitan District Commission (M. D. C.) was
charged by St. 1956, c. 581, with the maintenance of certain
public sidewalks in the city of Boston.   For this purpose
the M. D. C. hired private contractors.   Contracts covering
sidewalk repair work for which less than $1,000 was to be
paid could be and were awarded by the M. D. C. without
competitive bidding.   It was this type of contract which
was involved at the trial.

During the time covered by the transactions in issue the
M. D. C. and the State disbursing agencies observed the fol-
lowing procedure.   When complaints were received that

[5] This is G. L. c. 277, § 46, which provides:  "Two or more counts describ-
ing different crimes depending upon the same facts or transactions may be
set forth in the same indictment if it contains an averment that the different
counts therein are different descriptions of the same acts."

sidewalks at certain locations were in need of repair, one Fink, Chief Park Engineer of the M. D. C., designated his first assistant, one Sampson,[6] to cause an investigation to be made. If upon investigation the need for repair appeared, Sampson notified a contractor and asked him to submit a proposal for the work. The contractor then submitted a letter of proposal to Sampson. If Sampson recommended the proposal, it was approved by Fink and by the Commissioner of the M. D. C. A department purchase order was then sent to the contractor authorizing him to perform the work described in the letter of proposal. When the contractor completed the work, he submitted, as part of a single sheet printed form referred to as "standard invoice," prescribed by the Comptroller's Bureau of the Commonwealth (G. L. c. 7, §§ 13, 17), a voucher to the M. D. C. requesting payment for the work. He was required to submit an original and three copies of the standard invoice to the State agency (here the M. D. C.) for which the services were rendered. The standard invoice, in its upper third part, directed that the contractor by signature in ink there "certify that the goods were shipped or the services rendered as set forth below."· Below, in the middle third of the invoice a space was provided for a description of the goods delivered or services rendered. When the standard invoice was received by the bookkeeping department of the M. D. C., a copy was turned over to Sampson whose job then was to "see that the work had been done and to approve it or disapprove it." [7] If he approved, he so indicated by stamping "Approved" followed by his signature (original or stamped facsimile) on the face of the standard invoice. Thereupon, Fink rubber

---

[6] Sampson, having died in August, 1958, did not testify at the trial.

[7] The evidence indicated that Fink's division of the M. D. C. expended $20,000,000 per year; that sidewalk repair work expenditure amounted to less than one-hundredth of one per cent of that amount; that Sampson, as Fink's first assistant, shared in the over-all responsibility for the operation of Fink's division; that the task of checking a sidewalk repair job might fall on any one of a number of men working on a major job on a location near the under-$1,000 sidewalk repair job. There was no evidence that Sampson had personally checked the location in issue.

stamped on the face of the invoice a statement that the services described had been received, and signed it. Two copies of the standard invoice were retained by the M. D. C.

Thereafter a printed form, also prescribed by the Comptroller, captioned "Authorization for Payments," was completed by the M. D. C. and forwarded to the Comptroller. Completion of the latter form included among other requirements the signature of the M. D. C. business agent and of the Commissioner (by his agent) to a printed statement at the bottom of the form certifying "that the goods or services listed above have been received."

The Comptroller's office required from the M. D. C. the following documents for processing payment for work of the type under consideration: (a) the "Authorization for Payments," (b) two copies of the standard invoice (which bears the above described voucher), and (c) the letter of proposal. As one step in the auditing process, the Comptroller's office verified the signatures on the authorization for payment. In the pre-audit section, depending upon the nature of the transaction, a check was made of the contractor's voucher on the standard invoice to see if there was a satisfactory description of the materials furnished or work done. The practice in the Comptroller's office was to authorize payment on the voucher in the standard invoice. If there was a discrepancy between the proposal and the voucher in the invoice, payment was not authorized. If the work done was on a unit basis and the unit price was not stated in the voucher, reference was made to the contractor's proposal, and computations of the amount due for the number of units set out in "Description of Articles or Service" on the standard invoice were thereby made. The personnel in the Comptroller's office usually had no personal knowledge whether the services had actually been performed. Warrants for payment, submitted by the Comptroller to the Governor, Governor's Council, and Treasurer, were based on the certification of the department head that the services had been rendered *in accordance with the description in the voucher*. In the ordinary course of events payment to the contractor followed.

The Comptroller was required by law (G. L. c. 7, § 14) to keep in his office *all bills or vouchers on which money had been or might be paid* from the State treasury upon his certificate or the Governor's warrant. State agencies authorized to make contracts under which money might be made payable from the treasury were required to file certified copies thereof, before payment, with the Comptroller. Accordingly, the proposal, the authorization for payment, and one copy of the standard invoice were kept in the files of the Comptroller's office. The other copy of the standard invoice was remitted to the contractor.

More particularly relating to the case before us, the evidence was as follows: On April 29, 1954, a business certificate was filed at City Hall in Boston indicating that "B & M Construction" was being conducted by "Dorothy Iannello." (It was stipulated that the name "Dorothy Iannello" on the certificate had been signed by her defendant husband.) On September 2, 1958, during a period when there was much public discussion about the conflict between the private interests of public officeholders and the public interest, a business certificate was filed at City Hall, Boston, indicating that Del-Mar Construction Co. was being conducted by Maria T. Moscato. The latter is the daughter of the two defendants. The defendant Iannello, a member of the Committee on Rules and of the Metropolitan Affairs Committee of the House of Representatives, had inquired from time to time at the offices of the M. D. C. as to the availability of sidewalk repair contracts involving less than $1,000. He represented B & M Construction in obtaining this type of work. After the filing of the Del-Mar business certificate, he represented Del-Mar Construction Co. in getting similar contracts. Most, if not all, of the concrete sidewalk repair work for the M. D. C. involving less than $1,000 was done by B & M Construction or by Del-Mar Construction Co. Indisputably the number of such contracts was substantial, although never explicitly stated at the trial.

On September 9, 1957, Iannello sent a letter of proposal to Sampson in the following terms: "Will reconstruct ap-

proximately 1500 sq. ft. of damaged concrete walk in vicinity of 137 . . . [Gallivan] Boulevard, Dorchester. Will replace with 4 inches 1–2–3 concrete mix, and furnish all labor, trucking and material, at $.65 per sq. ft. Will leave location in orderly condition when work is completed. Price for this work will be . . . $975. B & M Constr. D. Iannello.''

On October 10, 1957, a standard invoice with a voucher describing the services was submitted to the M. D. C. ''For reconstructing approximately 1500 square feet of damaged concrete walk in the vicinity of 137 Gallivan Boulevard in accordance with . . . letter dated Sept. 9, 1957'' in the amount of $970.20.[8] The printed certification earlier referred to was signed ''Vendor B & M Constr. By D. Iannello.'' The stamped approval of Sampson and the certification of Fink were added to the standard invoice in the manner heretofore indicated. The ''Authorization for Payments'' was prepared and executed, and all the papers were processed in the manner outlined. Payment by check to B & M Construction as payee was made in the sum of $970.20.

On March 13, 1958, a letter was sent to Sampson in the following terms: ''Will reconstruct approximately 1,520 sq. ft. of damaged concrete walks from 137 to approximately 145 Gallivan Boulevard, Dorchester, Mass. Will replace with 4″ of 1–2–3 Concrete Mix with Lamp Black at $.65 per sq. ft. Will furnish all Labor, Trucking and Material will also furnish 4″ of Cinder Base. Will leave location in orderly condition when work is completed. Price for this work will be $988. D. Iannello, B & M Construction.''

On June 5, 1958, a voucher on the standard invoice was submitted in the usual form describing the services: ''For replacing concrete walks from 137 to 145 Gallivan Boulevard, Dorchester, in accordance with . . . letter dated March 13, 1958,'' in the amount of $983.06.[9] The printed certification was signed ''Vendor B & M Constr. By D.

[8] $975 minus a discount of $4.80.
[9] $988 minus $4.94 discount.

Iannello.'' The routine administrative steps heretofore outlined were followed, and in due course the Commonwealth's check in the sum of $983.06 was made payable to B & M Construction.

It was stipulated on the trial record that the name ''D. Iannello'' on the letters of proposal and on the vouchers in the standard invoices submitted in the name of B & M Construction were written by Iannello. It was further stipulated that the proposals and standard invoices bearing Dorothy Iannello's name were ''delivered or caused to be delivered to the MDC by the defendant Dorothy Iannello, either by herself in person or by a person duly authorized to make the delivery for her.'' The receipt of payment by B & M Construction for the work described in both vouchers was admitted by the defendants.

The jury took a view of the locations where the work was allegedly done and photographs of the same were admitted in evidence. All of the witnesses who testified were called by the Commonwealth. Among these was one Battles, qualified as an expert in concrete design and construction, who gave his opinion, based on an examination made by him on August 12, 1960, of the location described in the letter of proposal of September 9, 1957, and invoice of October 10, 1957, that an area of 1,086 square feet was within a five year placement and that the remainder was older. He had examined 100 feet to the right of 137 Gallivan Boulevard and 200 feet to the left of it. The placement made within five years extended from 137 to 145 Gallivan Boulevard. Battles gave the further opinion, based upon an examination made by him on August 16, 1960, of the location described in the letter of proposal of March 13, 1958, and invoice of June 5, 1958, that the latter location was exactly the same area of the sidewalk that he measured on August 12, 1960, and was a ''placement within the past five years'' and had ''an edge tooling consistent throughout and different from the adjacent sidewalk'' which was an older placement.

The defendants contend that on the foregoing evidence and stipulations the verdicts of guilty of the crime of lar-

ceny by false pretences cannot stand.  Specifically it is argued that none of the essential elements of the offence has been made out.  We shall consider this argument with respect to the defendant Iannello, and reserve the case against his wife until later in the opinion.

"To constitute the crime of larceny by false pretences (G. L. c. 266, § 30), it must appear that there was a false statement of fact known or believed by the defendant to be false made with the intent that the person to whom it was made should rely upon its truth and that such person did rely upon it as true and parted with personal property as a result of such reliance.  *Commonwealth* v. *Green,* 326 Mass. 344, 348, and cases cited.  *Commonwealth* v. *Greenberg,* 339 Mass. 557, 574–575.  *Commonwealth* v. *Barrasso,* 342 Mass. 680, 683."  *Commonwealth* v. *Louis Constr. Co. Inc.* 343 Mass. 600, 604.

The false pretence upon which the Commonwealth rests its case was the statement made by Iannello in the standard invoice of June 5, 1958, to the effect that B & M Construction had, in accordance with the letter of proposal of March 13, 1958, replaced approximately 1,520 square feet of concrete sidewalk from 137 to 145 Gallivan Boulevard.

We think that the testimony of Battles provided an adequate basis for a finding either that B & M Construction had done none of the work set forth in the voucher of June 5, 1958, or that, if any work had been done, it was only 1,086 square feet, and not the 1,520 square feet which was represented as having been done and for which payment was made by the Commonwealth.  In either case, the statement in the voucher which specified performance in accordance with the letter of proposal of March 13, 1958, could be found to be a false statement.

We likewise think that the jury could find that, when Iannello made the false statement, he knew or believed it to be false.  The transcript is replete with evidence that he, exclusively, spoke and acted for B & M Construction and in fact had signed all proposals and vouchers for sidewalk repairs for the M. D. C.  This evidence of the personal involvement of Iannello in the affairs of B & M Construction

which he alone represented before the M. D. C. formed an adequate basis for an inference by the jury that he had personal knowledge of what had or had not been done at the location in issue.

It is argued, nevertheless, that, even if it be conceded that the statement in the voucher was "utterly false and a naked lie," there is lacking the essential element that the statement was made with the intent that it be relied upon, or in other words, that the intent to defraud has not been proved. The recent case of *Commonwealth* v. *Louis Constr. Co. Inc.* 343 Mass. 600, 604–605, is cited by Iannello in support of this contention. In point of fact and of substance, however, that case is readily distinguishable from the one before us. In the *Louis Constr. Co. Inc.* case, the contract was a special contract, undertaken by the defendant at the request of the M. D. C. to avoid damage from an impending hurricane; the contract was admittedly fully performed and the agreed compensation was reasonable; the bills submitted by the subcontractors in support of the defendant's voucher were correct when the voucher was submitted; and the bill which resulted in the duplication of payment by the Commonwealth for two laborers in the sum of $62 each (the M. D. C. having a timekeeper on the job) was, we held in the particular circumstances, as consistent with a careless checking of bills as with a calculated attempt to defraud. Accordingly, the caveat stated in *Commonwealth* v. *Drew,* 19 Pick, 179, 184–185, and quoted in the opinion, 343 Mass. 600, 604–605, was held applicable, and the transaction in consequence was deemed not tainted with criminality. In the case before us, on the other hand, there was evidence of a long and steady course of dealing between Iannello and the M. D. C. with respect to a particular type of routine repair work, instigated and, it could be found, continued at his persistent requests. It could readily be found that he was thoroughly familiar with the steps through which a voucher for this type of work was processed for payment by the Commonwealth.[10] Against this

---

[10] There was evidence that when orders submitted by Iannello were delayed he had called Fink and said: "I have an order in here and I want to know where it is and I will find out where it is if I have to go downstairs."

background, granted the fact of the falsity of the voucher and the further fact of Iannello's knowledge of its falsity, and recognizing the elementary principle that in any case the determination of intent is primarily a question to be resolved by the jury in the light of all relevant circumstances (see *Commonwealth* v. *Jeffries,* 7 Allen, 548, 567–568. *Commonwealth* v. *Aronson,* 312 Mass. 347, 351–352) we cannot say that the finding of an intent to deceive was without sound evidential basis.

Finally, the contention is advanced that the evidence does not show that the Commonwealth parted with its money in reliance upon Iannello's voucher, but rather that it indicates that the Commonwealth relied upon the inspection and certifications of approval of its own agents. The pleadings and the evidence refute this contention as it applies to nonreliance upon the voucher. Neither the indictment nor the specifications allege reliance by or upon any individual. The indictment alleges that the defendants stole money from the Commonwealth. The specifications were that the theft was accomplished by false pretences and that the time, manner, and means of perpetration were the letter of proposal of March 13, 1958, the standard invoice of June 5, 1958, in connection therewith, and the draft issued thereon on June 25, 1958. The conclusion seems inescapable that the plain design and purpose of incorporating the voucher in each of the copies of the standard invoice was to hold the contractor to the terms of his voucher through every step of the way to payment. If no voucher had appeared on the standard invoice, it would have been rejected at the outset. If there had been reason to believe that the voucher was false, payment of the invoice would not have been authorized. The testimony of Fink in cross-examination that he relied upon Sampson's approval, and the testimony of the deputy comptroller, in response to a leading question on cross-examination, that he relied upon the signatures of other State agents and considered them "decisive," does not nullify the force and effect of the representation made and required

to be made on the standard invoice form prescribed by the Comptroller pursuant to statutory authority. "It is the settled law of this Commonwealth in actions for deceit and in prosecutions for obtaining money under false pretences through false and fraudulent representations that the representations need not be the sole or predominating motive that induced the victim to part with his money or property, but that it is enough if they alone or with other causes materially influenced him to take the particular action that the wrongdoer intended he should take as a result of such representations and that otherwise he would not have taken such action." *National Shawmut Bank* v. *Johnson,* 317 Mass. 485, 490, and cases cited. "Other statements or considerations not amounting to false pretenses may cooperate to that result without impairing the force of the criminal act." *Commonwealth* v. *Farmer,* 218 Mass. 507, 513. *Commonwealth* v. *Greenberg,* 339 Mass. 557, 575.

That Iannello's voucher was not, in specie, before the Governor's Council or the Governor when the warrant for payment was signed, nor before the State Treasurer when he signed the draft payable to B & M Construction, does not, in our judgment, alter the result. "It was the same, identical, false representation on another paper and in another shape, but equally false and aimed at the same result." *People ex rel. Phelps* v. *Court of Oyer & Terminer County of N. Y.* 83 N. Y. 436, 453. *Commonwealth* v. *Mulrey,* 170 Mass. 103, 109.

We do not agree with the defendants' contention in so far as it would restrict the element of reliance by the Commonwealth to reliance upon its own inspectors or agents. We think that the provisions of G. L. c. 7, § 14, which require that "vouchers on which money has been or may be paid . . . shall be kept in the comptroller's office" are declarative of the Commonwealth's purpose and intent, as a body politic, to rely upon the contractor's vouchers as the basis for payment irrespective of the remissness of one charged with the duty of inspection, or of the state of mind of individuals in its employ through whose hands the vouchers may pass.

The defendants' contention was rejected in principle by Holmes, J., in *Commonwealth* v. *Mulrey,* 170 Mass. 103.   It has been rejected in other jurisdictions.   *People ex rel. Phelps* v. *Court of Oyer & Terminer of the County of N. Y.* 83 N. Y. 436.   *People* v. *Hoffman,* 142 Mich. 531, and cases cited, including *Commonwealth* v. *Mulrey.   Rand* v. *Commonwealth,* 176 Ky. 343, 349.   *State* v. *Lynn,* 3 Pennewill (19 Del.) 316, 331–334.   *State* v. *Stewart,* 9 N. D. 409, 416–417.   See cases collected in Anno. 21 A. L. R. 180, and decisions supplementary thereto.   In *People ex rel. Phelps* v. *Court of Oyer & Terminer of the County of N. Y.* 83 N. Y. 436, 448, decided earlier than, but not cited in *Commonwealth* v. *Mulrey,* 170 Mass. 103, on facts and accounting procedures in many respects similar to those now before us, the court said, "We find the accused at the beginning and the end of the transaction.   He who planned the artifice is found at the end of the chain of events possessing himself of the fruits of the fraud.   What he originally intended was in fact accomplished."   The verdict of the jury makes the statement applicable here.

With regard to Iannello, the motions for a directed verdict and to set the verdict aside (see *Commonwealth* v. *Gricus,* 317 Mass. 403, 405–407) were properly denied.   His conviction must stand.

We think, however, that the evidence is not sufficient to sustain the verdict against Mrs. Iannello.   All the evidence points to the fact that her name was used by her husband on the business certificate, the letters of proposal, and the vouchers as a front to conceal his own business relationships with the M. D. C.   The stipulation that the letters of proposal and vouchers were "delivered or caused to be delivered to the MDC by the defendant Dorothy Iannello, either by herself in person or by a person duly authorized to make the delivery for her" is, on the record, insufficient to exculpate Iannello on the one hand or to incriminate Mrs. Iannello on the other.   As to the latter, proof of the requisite element of knowledge of the falsity of the statement is lacking.   The knowledge of her husband is not by

virtue of their relationship to be imputed to her. There is no other evidence on the issue.

The judgment against Charles Iannello is affirmed. The judgment against Dorothy Iannello is reversed.

*So ordered.*