COMMONWEALTH *vs.* CHRISTOPHER BARDEN LEWIS.

No. 96-P-1218.

Middlesex. May 25, 1999. - December 9, 1999.

Present: ARMSTRONG, PERRETTA, & GELINAS, JJ.

*Larceny. False Pretenses. Practice, Criminal,* Venue, Bill of particulars, Argument by prosecutor, Instructions to jury, Required finding, Assistance of counsel, Confrontation of witnesses, Jury and jurors. *Constitutional Law,* Assistance of counsel, Confrontation of witnesses.

In a criminal case, the judge's findings of fact supported his ruling on the Commonwealth's motion under G. L. c. 277, § 57A, that the indictment for larceny by false pretense was properly triable in Middlesex County. [347]

Checks and bank records introduced in evidence at the trial of an indictment for larceny by false pretense supported the charge and did not establish a crime different from that alleged and further described in a bill of particulars, and the prosecutor's reference to that evidence in closing argument was proper. [347-349]

At the trial of an indictment alleging larceny by false pretense, no substantial risk of a miscarriage of justice arose from the judge's failure to instruct the jury on her own motion that they had to find unanimously beyond a reasonable doubt that the defendant committed at least one of the acts set forth in the Commonwealth's bill of particulars and that such act constituted a false representation that led to the victim's parting with her money. [349-352]

A criminal defendant did not demonstrate that his trial counsel was ineffective for his failure to call a certain witness, whose supposed testimony did not appear to be helpful to the defendant's case. [352-353]

No reversible error appeared on the record of a criminal trial by reason of the asserted legal insufficiency of the evidence, evidentiary rulings, closing argument by the prosecutor, or alleged extraneous influence on the jury. [353-355]

INDICTMENT found and returned in the Superior Court Department on February 24, 1994.

A motion for leave to proceed was heard by *Robert H. Bohn, Jr.,* J.; the case was tried before *Martha B. Sosman,* J., and a motion for postconviction relief was heard by her.

*John J. Barter* for the defendant.

*Loretta M. Lillios*, Assistant District Attorney, for the Commonwealth.

GELINAS, J. Found guilty by a Superior Court jury on an indictment alleging larceny by false pretense,[1] and sentenced to serve a term at the Massachusetts Correctional Institution at Cedar Junction of not less than four and one-half years nor more than five years, Christopher Barden Lewis appeals both his conviction and the denial of his motion for a new trial. He claims error in (1) the venue of the trial; (2) the introduction of evidence exceeding the bill of particulars; (3) the judge's instructions and lack thereof; (4) the assistance of trial counsel; (5) the denial of his motion for a required finding; (6) the limits placed on his cross-examination of the complainant; (7) the prosecution's closing arguments; (8) alleged juror contact with the complainant; and (9) the judge's denial of a posttrial, pre-appeal motion for a new trial. We affirm the defendant's conviction and the denial of his motion for a new trial, reciting the facts generally, and reserving for discussion certain details, all of which might have been found by the jury based upon the evidence.

Having befriended the victim, Maureen Brent, when both served as jurors in a mock trial held in Cambridge, the defendant, over the course of some five months, described to her in detail his plan to start a "three-tier" business venture that would include an international investment advisory business, a pro bono legal services agency staffed by volunteers and a division that would sublet space to prominent attorneys who would assist in the pro bono work. The defendant told her that initial financing for the business would be obtained from an Egyptian businessman, an associate of his by the name of Abdul Mequid. He invited Brent, with her experience and aspiration for a career in legal advocacy, to direct the pro bono legal services division of the new business. (She had worked as a volunteer and then as a paid staff person in the office of a major bar association, assisting with its pro bono programs.) He named specific at-

---

[1]The indictment alleged that "On diverse dates from on or about the Twelfth day of August . . . [1991] and continuing to on or about the Fifth day of March . . . [1992], in the county of Middlesex aforesaid, with intent to defraud[, the defendant] did obtain by a false pretence the property of Maureen Brent to wit: money, in an amount of more than two hundred and fifty dollars." There was no indication whether the indictment charged under G. L. c. 266, § 30, or under G. L. c. 266, § 34.

torneys in the Boston area who had agreed to participate in the business.[2] He suggested he would try to get Brent a salary of $30,000 to $35,000 and dental and health benefits as director of the legal advocacy division of the business. At his first meeting with Brent, the defendant stated that he would be leasing and renovating office space at 75 State Street, a new and desirable Boston location, and that he was in negotiation with the building manager for rental of the space. He later described how the space would be configured and on two occasions invited Brent to view the premises. The defendant canceled each visit at the last minute, telling Brent that the building manager had suddenly become unavailable.

In the late fall or early winter of 1991 and again in February of 1992, the defendant represented specifically to Brent that he was being pressured by the manager at 75 State Street to commit funds to secure the space in the building and that Mequid, who was to provide the funds, was traveling outside the country and could not be reached. On the first occasion the defendant stated that they were going to lose the space. He asked Brent for a short-term loan[3] of $30,000 to secure the space until Mequid's return, and Brent agreed.[4] The two met in an office belonging to John Williams, whom the defendant described as

[2]Some of the attorneys testified at the defendant's trial that they had represented the defendant on unrelated matters (omitting mention of their type and any detail) but had never heard of, much less discussed or agreed to, any aspect of the plan. They had represented the defendant on prior criminal charges, including a charge involving securities fraud for which the defendant was on probation while he was involved with Brent.

[3]Although couched in the form of a loan, the transaction could still result in a larceny by false pretense even if the defendant intended to repay the loan and even if the loan had been repaid; the gravamen of the charge is obtaining the funds by a false pretense and not whether there was present intent to repay or actual repayment. See *Commonwealth* v. *Stovall*, 22 Mass. App. Ct. 737, 742 (1986). Contrast *Commonwealth* v. *Moreton*, *ante* 215 (1999) (embezzlement).

[4]In describing the conversations that led to the first loan, Brent testified, "He explained that it was difficult for him to get in touch with Abdul Mequid, and that they were putting pressure on him at 75 State Street. They [the building managers, the property managers] wanted to know if he was interested in these offices, or not. They needed to know should they start building out the separate offices, and make the commitment of money. They needed a commitment. . . .

"He [the defendant] was afraid we were going to lose the office space. . . . The fact that there really was no money around; and he was getting very

an associate. Citing temporary difficulties with his bank accounts, the defendant asked Brent to pay the loan proceeds to him in two amounts, a check in the amount of $24,000 payable to Williams, so that the money could be run through Williams's account, and $6,000 in cash to be paid directly to the defendant. Brent complied.

As evidence of the loan, the defendant prepared and signed a promissory note in the amount of $30,000 payable to Brent.[5] The note was payable in full on March 1, 1992, and would bear no interest if paid on the due date but high interest if not paid by then. As additional assurance that the note would be paid, the defendant simultaneously gave Brent a post-dated check.[6] The check was written on an account that the defendant had closed some twenty days earlier.

Brent and her son then went to Florida, remaining there until February of 1992. In early February the defendant called her and again represented that he was being pressured by the manager at 75 State Street for funds to secure the property and for the renovations, and that Mequid continued to be unavailable.[7] He asked Brent to wire an additional $36,000 for this purpose, $6,000 in cash directly to the defendant and $30,000 to the account of Williams. The defendant mailed a second promissory note, signed by him, to Florida. The note contained a space for Brent's signature and she returned a signed copy to the defendant. Brent wired $30,000 to Williams's account. She and her son returned from Florida shortly thereafter and she gave the additional $6,000 in cash to the defendant.

After some eight months of almost daily conversations exploring one or another aspect of the program, and after Brent had loaned the defendant some $66,000 based on representations

---

nervous. We were going to lose the space. . . .

"Could I — would it be possible for me to come up with some money until Abdul Mequid could be located . . . ."

[5]Though nugatory, Brent signed the note as well, at the defendant's request. Williams notarized the note. The record is silent as to whether one or both signatures were notarized.

[6]When, in addition to having Brent sign the note, the defendant provided her with the post-dated check, Williams laughingly stated, "[I]t's a little bit of . . . overkill." The record does not reveal whether Williams's participation, including his comments, work on the note, and receipt of the funds, resulted in his being prosecuted, either as a principal or as an accessory.

[7]With regard to the second loan, Brent testified that "again, he was having a difficult time reaching Abdul Mequid, and that more money was needed [for] . . . the office space."

that were false, the defendant suddenly ceased taking Brent's calls or returning her messages. The money was never repaid.

1. *Venue.* The defendant complains that the trial should not have been held in Middlesex County. General Laws c. 277, § 59, permits prosecution of a defendant in cases of larceny by false pretense in any county where the representations were made or the money or goods were received.[8] In accordance with G. L. c. 277, § 57A,[9] by motion prior to trial, the Commonwealth sought leave to proceed in Middlesex County. The motion judge (who was not the trial judge) found that many of the representations concerning the enterprise initially were made at a university parking lot in Cambridge, which is in Middlesex County, where the defendant and Brent talked after serving as jurors in a mock trial program. The defendant at that time offered a fairly complete outline of the supposed business venture, including representations concerning the rental of space at 75 State Street that formed the basis of the specific representation that caused the victim to part with her money.

The motion judge's specific findings of fact in this regard supported his ruling that the trial could proceed in Middlesex County. See *Commonwealth* v. *Kiernan*, 348 Mass. 29, 52-53 (1964), cert. denied, 380 U.S. 913 (1965).

2. *Exceeding limits of bill of particulars.* At trial the prosecutor introduced certain bank records and a check written on an account the defendant had closed twenty days before the check's issuance, and argued in closing: "Because there's two documents that put together, I suggest, combined — you can convict solely on these two documents, if you want to. You don't have to, but you can. . . . And I suggest, if nothing else — and

---

[8]General Laws c. 277, § 59, provides: "The crime of obtaining money or a personal chattel by a false pretence, and the crime described in section thirty-one of chapter two hundred and sixty-six, may be alleged to have been committed, and may be prosecuted and punished, in any county where the false pretence was made, written or used, or in or through which any of the property obtained was carried, sent, transported or received by the defendant."

[9]General Laws c. 277, § 57A, provides: "A defendant shall not be discharged for want of jurisdiction if the evidence discloses that the crime with which he is charged was actually committed without the county or the territorial jurisdiction of the court in which he is being tried; provided, that the attorney general or the district attorney petitions to the court before proceeding with the trial for leave to proceed, stating that he is in doubt from the state of the evidence then in his possession as to whether or not the crime was committed within the county or the territorial jurisdiction of the court, and the court after hearing said petition orders the trial to proceed."

there's a whole lot more; I suggest there is, but if nothing else, you can convict Christopher Lewis solely on these two pieces of paper that I am holding in my hands — Exhibit No. 6 and Exhibit No. 13. And I ask you to really consider those two exhibits."

The defendant claims that introduction of the checks and bank records and reference to them in the prosecutor's closing argument had the effect of adding material not specified in the bill of particulars[10] filed by the Commonwealth, or of presenting evidence of a new charge (larceny by check) that was not alleged. We reject both contentions.

First, as to the bill of particulars, its purpose was to give the defendant "reasonable knowledge of the nature and character of the crime charged." *Commonwealth* v. *Iannello*, 344 Mass. 723, 726 (1962). *Rogan* v. *Commonwealth*, 415 Mass. 376, 378 (1993). A bill of particulars need not describe in detail every item of evidence that the Commonwealth intends to introduce, and while the bill of particulars restricts the case which the Commonwealth is entitled to prove, *Commonwealth* v. *Iannello*, *supra*; *Rogan* v. *Commonwealth*, *supra*, "[a] defendant in a criminal proceeding is not entitled by a motion for a bill of particulars to secure a résumé of the evidence that the Commonwealth intends to introduce at the trial, or to have such motion treated in all respects as if it were a set of interrogatories." *Commonwealth* v. *Amirault*, 404 Mass. 221, 233 (1989), quoting from *Commonwealth* v. *Hayes*, 311 Mass. 21, 25 (1942).

---

[10]In response to the judge's allowance of the defendant's motion for particulars, the Commonwealth responded as follows: "*Time*: 1. The offense was committed on or about August 12, 1991, and continued to or about March 5, 1992. *Place*: 2. The offense was committed in Cambridge, Watertown and Boston, Massachusetts. *Manner and Means*: 3. The offense was committed by the following manner and means: The defendant did obtain under false pretenses, the property of Maureen Brent, to wit, money of more than two hundred and fifty dollars. The defendant made the following false representations to Maureen Brent, which induced her to part with her money: (a) That the defendant was forming a legal advocacy firm and that Maureen Brent's money would be used to fund that firm; (b) That Maureen Brent and her son could be employed by that firm; (c) That numerous lawyers, including those on a list provided by the defendant to Mrs. Brent, would be involved with that firm; *(d) That the defendant had contracted for office space at 75 State Street, Boston, Massachusetts for use by that firm*; (e) That the defendant would repay Maureen Brent for her investment in the legal advocacy firm. Maureen Brent tendered her money to the defendant on December 12, 1991, on February 3, 1992 and in March, 1992." (Emphasis supplied.)

Introduction of the bank records and the check, without objection, showing that the defendant was using a check drawn on a closed account purportedly to secure the loan from Brent, tended to establish not only that his expressions of intent to repay the money were false, but, as well, that the defendant knew that his statements regarding the loan and the need for funds to preserve space at 75 State Street were false. Further, issuance of the check had the effect of inducing Brent to rely on the representation. Far from establishing a different crime from that alleged in the indictment and described in the bill of particulars, the evidence had the effect of supporting the matters therein. Once admitted, the check and bank records were the proper subject of argument. Viewing the prosecutor's closing argument in its entirety, together with the judge's instructions to the jury and the evidence at trial, *Commonwealth* v. *Doucette*, 9 Mass. App. Ct. 846, 847 (1980); *Commonwealth* v. *Rogers*, 43 Mass. App. Ct. 782, 783 (1997), and cases cited, we find no error.

3. *Specific unanimity instruction.* The defendant contends that, although he made no request at trial for a specific unanimity instruction, the judge erred in not instructing the jury, sua sponte, that they had to find unanimously beyond a reasonable doubt that the defendant committed at least one of the acts set forth in the Commonwealth's bill of particulars, and that such act constituted a false representation which led to the victim's parting with her money.

As the issue was not preserved at trial[11] and was not resurrected by full consideration on the motion for new trial,[12] we consider whether in failing to give a specific unanimity instruction sua sponte there was a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman*, 352 Mass. 556 (1967). *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10 (1986). We find no such risk.

[11]Rule 24(b) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 895 (1979), provides in part, "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, specifying the matter to which he objects and the grounds of his objection."

[12]In the course of the hearing on the defendant's posttrial, pre-appeal motion for new trial, the defendant raised the issue of the need for a specific unanimity instruction. The judge suggested that, had she been asked, she would have given the instruction. We find that the judge's brief discussion was such that the issue was not "considered fully on its substantive merits." *Commonwealth* v. *Hallet*, 427 Mass. 552, 555 (1998). We therefore do not consider the issue as if it had been properly preserved. *Ibid.*

Where there are multiple incidents supported by the evidence on an indictment charging criminal activity that occurred "on diverse dates," with each specific activity having its own discrete fact pattern that might result in conviction, a specific unanimity instruction may be required to assure that jurors not only agree unanimously on guilt but agree unanimously that at least one of the incidents alleged was proven to have occurred beyond a reasonable doubt. *Commonwealth* v. *Conefrey*, 420 Mass. 508, 513 (1995). In cases where an instruction has been properly requested, the instruction should be given. *Commonwealth* v. *Comtois*, 399 Mass. 668, 676-677 n.11 (1987). *Commonwealth* v. *Conefrey, supra* at 514. We conclude that in this case, where there were many false representations representing one scheme, and one particular false representation (regarding the office space at 75 State Street) supported by the others, used on two occasions to induce the payment of money, and no request for a specific unanimity instruction, there was no need for the judge, sua sponte, to give such an instruction. See in this regard *Commonwealth* v. *Morrill*, 8 Cush. 571, 574 (1851); *Commonwealth* v. *O'Brien*, 172 Mass. 248, 254 (1898). The uncontroverted evidence recited above was more than ample to sustain conviction as to each of the two incidents of Brent's parting with her money. *Commonwealth* v. *Comtois, supra* at 676-677. *Commonwealth* v. *Lemar*, 22 Mass. App. Ct. 170, 172 (1986). The evidence did not create the risk that the jury would reach a nonunanimous verdict. See *Commonwealth* v. *Comtois, supra* at 677 ("it does not appear likely that the jury verdict would have been different even if the judge had given the specific instruction now requested by the defendant"). See also *Commonwealth* v. *Kirkpatrick*, 423 Mass. 436, 444, cert. denied, 519 U.S. 1015 (1996); *Commonwealth* v. *Ramos*, 47 Mass. App. Ct. 792, 798-799 (1999). Contrast *Commonwealth* v. *Conefrey, supra* at 514.

The crime of larceny by false pretense, G. L. c. 266, § 30, requires proof of four elements: "(1) [that] a false statement of fact was made; (2) [that] the defendant knew or believed the statement to be false when he made it; (3) [that] the defendant intended that the person to whom he made the false statement would rely on it; and (4) [that] the person to whom the false statement was made did rely on it and, consequently, parted with property." *Commonwealth* v. *Reske*, 43 Mass. App. Ct. 522, 524 (1997). The evidence shows that many, if not most, of

the defendant's statements to Brent were false, and that he knew they were false. They supported the statement, also false, that if he did not obtain money, he would lose the space at 75 State Street.

The jury were warranted in finding beyond a reasonable doubt that the statement concerning the need for funds because the "property managers were pressuring him" was false (based on Brent's testimony about the request, the property manager's testimony that he had never heard of the defendant or of any project to start the business described to Brent by the defendant, and the absence of any record of discussion about renting space to the defendant under any circumstance); that the defendant knew it was a false statement on the two occasions he made it (based on Brent's testimony, the property manager's testimony, and the defendant's purporting to secure the loan with a post-dated check written on an account that the defendant had closed); that he made the false statement with the intent that Brent rely on it (based on the request being predicated on the purported problem with the rental property, and his acceptance of the funds); and that Brent relied on the statements (based on her parting with approximately $66,000). The other statements set the stage, and contributed to Brent's parting with her funds.

The jury were warranted in finding that the specific representation concerning pressure from the property manager to secure the leased space and begin the renovations was material to Brent's parting with her funds. Whether the jury considered that Brent relied on other statements made by the defendant or relied solely on the statement concerning the difficulty with the leased space is inconsequential; the Commonwealth need prove only that the representation made concerning the possible loss of property at 75 State Street was material to Brent's parting with the funds. See *Commonwealth* v. *Edgerly*, 6 Mass. App. Ct. 241, 263 (1978), and cases cited therein; *Commonwealth* v. *Stovall*, 22 Mass. App. Ct. 737, 741-742 (1986).

The evidence recited above, viewed in the light most favorable to the Commonwealth, *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979); *Commonwealth* v. *Russell*, 46 Mass. App. Ct. 307, 308 (1999), was sufficient to survive a motion for a required finding. See *Commonwealth* v. *Comtois*, 399 Mass. at 676-677; *Commonwealth* v. *Lemar*, 22 Mass. App. Ct. at 172. The trial judge, also the motion judge, correctly charged the jury on the law regarding larceny by false pretense, and gave a

general unanimity charge. There was at least one representation used on two occasions and supported by many other false representations, which met the criteria for conviction. Further support for our ruling that no specific unanimity instruction was required can be found in the fact that, on the Commonwealth's evidence, there was but a single larceny comprised of successive takings achieved by a "single, continuing, criminal impulse or intent . . . pursuant to the execution of a general larcenous scheme." *Commonwealth* v. *England*, 350 Mass. 83, 86 (1966). See *Commonwealth* v. *O'Brien*, 172 Mass. at 254.

4. *Ineffective assistance of counsel.* The defendant alleges ineffective assistance of counsel based primarily on the failure to call Alfred C. Myers (Myers) as a witness for the defense. Myers, who had provided an affidavit dated October 19, 1992,[13] would have testified that, while acting as mediator in the dispute between Brent and the defendant some three months after the defendant defaulted on the note, Brent had told him that the $6,000 cash payments in each instance had not in fact been made but were to constitute the interest on the notes. Myers's affidavit further suggested that he advised Brent at that time that the $6,000 was in violation of the criminal usury statute, G. L. c. 271, § 49(*a*). Myers was reported to be hospitalized during the time of trial, and trial counsel for the defendant reviewed his proposed testimony with the court. In the affidavit Myers styled himself as "mediator," although the record is bereft of any reference to how he achieved the designation. Myers was also the manager of 171 Milk Street, the building where the defendant had rented office space, seeing to the rental of space to the defendant, who moved into the suite in April. This relationship would open to question Myers's impartiality. The District Court where the affidavit was on file entered judgment for Brent in the full amount of the notes, plus interest. The record is silent as to whether Myers's testimony or the affidavit was actually introduced in the civil proceeding. If so, neither was credited.

In the instant case, counsel was able to introduce testimony of Myers's son, Matthew, who testified to the defendant's occupancy of the suite at 171 Milk Street, thus establishing the relationship between Myers and the defendant; but Matthew

---

[13]The affidavit, filed in this case in connection with the motion for new trial, was originally filed in a civil action brought by Brent in her attempt to collect on the loans.

Myers knew nothing about the mediation meeting between Brent and the defendant. Had Myers testified, moreover, he would not have had anything to say about the $54,000 that Brent parted with by payment in check to Williams, done at the defendant's request.

As the judge suggested in her discussion on the motion for new trial, "as long as they [Commonwealth] show, as they did, that money was extended in an amount above two hundred and fifty dollars," the issue whether the amount was $54,000 or $60,000 was irrelevant. In fact, Myers's testimony, if given in accordance with his affidavit, would tend to show without question that the defendant did indeed issue the notes and receive at least $54,000. Whether some portion of the money paid by Brent was in the form of cash or check, or whether it was in fact usurious, is immaterial for the purposes of this appeal. See *Commonwealth* v. *O'Brien*, 172 Mass. at 253-254 (Holmes, J.) ("[T]he criminal law has a public end in view, namely to deter people from swindling. . . . [W]e think this end is more effectually reached if we do not read into the . . . [larceny] statute . . . an implied exception which allows a knave to cheat any one out of his money if the knave can succeed in persuading his victim into a scheme which has any technical element of illegality on the victim's side").

For the foregoing reasons, any failure to elicit this same testimony from Myers's son would not constitute ineffective assistance of counsel. To succeed in showing ineffective assistance, the defendant must show both that (1) "there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer" and (2) defense counsel's performance "deprived the defendant of an otherwise available, substantial ground of defen[s]e." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). The defendant fails both of these tests.

5. *Other contentions.* A review of the record leads us to conclude that the remaining claims of error are without merit. We review each briefly.

As noted above, the evidence viewed in the light most favorable to the prosecution, *Commonwealth* v. *Latimore*, 378 Mass. at 676-677; *Commonwealth* v. *Russell*, 46 Mass. App. Ct. at 308, was sufficient to defeat a motion for required finding and was sufficient as matter of law to support the verdict of guilty.

We find no merit to the defendant's allegation that he was deprived of his Federal and State constitutional rights to confront his accuser. During the course of Brent's cross-examination (this was extensive, covering 140 pages of transcript), the judge sustained the Commonwealth's objections to certain of defense counsel's questions concerning aspects of the civil and bankruptcy actions brought by Brent in an effort to collect the purported loans. The judge ruled that those questions concerned both the legal pleadings in these matters and a formal agreement filed in the bankruptcy action, and that Brent was not competent to testify to either of those matters. The judge permitted questions within Brent's competence concerning both the civil suit and the bankruptcy action. To the extent possible, the issue was fully aired. See *Commonwealth* v. *LaVelle*, 414 Mass. 146, 154-155 (1993). The defendant's right to confront his accuser was not impinged, and there was no abuse of the judge's discretion.

We have discussed the claim of error concerning improper closing argument above, and find none. A review of the arguments of both counsel, the evidence, and the judge's instruction shows that the prosecutor properly argued the evidence and the reasonable inferences to be drawn therefrom. This review further reveals that the judge's instructions, both as to consideration of the evidence and the law, were proper and appropriate. The judge's instructions did not improperly comment on the evidence nor misstate the burden of proof.

As to the defendant's claim that there may have been influence on the jury from outside the court room, on the third day of trial, the defendant suggested that a juror was seen leaving the court house in proximity to Brent.[14] No conversation or other contact was suggested. The judge conducted a general inquiry of the jury as to whether they had contact outside the court room with anyone associated with the case, and all of the jurors answered in the negative. The judge made the juror in question an alternate but declined to conduct an individual voir dire. The judge repeatedly and forcefully admonished the jurors to avoid discussing the case with anybody outside the court room. Presented with nothing more than a simple allegation of proximity, the judge acted properly and with an abundance of caution. See *Commonwealth* v. *Ali*, 43 Mass. App. Ct. 549,

---

[14]More than three years later, in affidavits filed in connection with the motion for a new trial, the defendant's mother and sister alleged that they saw Brent in proximity to two jurors.

564-565 (1997).

The judgment and the order denying the motion for a new trial are affirmed.

*So ordered.*