COMMONWEALTH *vs.* FRANCIS W. KIERNAN & others.[1]

Suffolk.   May 13, 1964. — October 5, 1964.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Larceny. False Pretences. Conspiracy. Massachusetts Parking Authority. Practice, Criminal,* Appeal with assignments of error; Exceptions: saving of exception, failure to save exception; Grand jury proceedings; Suppression of evidence; Examination of jurors; Venue; Conspiracy case; Assent to procedure. *Pleading, Criminal,* Bill of particulars. *Jury and Jurors. Evidence,* Illegally seized material, Conspirator. *Agency,* Agent's fraud, Agent's knowledge.

An assignment of error on an appeal under G. L. c. 278, §§ 33A–33G, in a criminal case was not considered by this court where it was based on an exception taken too late under Rule 72 of the Superior Court (1954).   [33]

Indictments for larceny and for conspiracy to commit larceny from the Massachusetts Parking Authority were not invalid on the ground that the grand jury was prejudiced against the defendants by adverse publicity prior to the return of the indictments.   [33]

There was no error in the denial of a motion for further particulars to indictments in the statutory form already supplemented by adequate bills of particulars.   [33–34]

There was no error in a criminal case in the denial of the defendant's pre-trial motion to suppress unidentified evidence allegedly obtained from an illegal search and seizure and to examine the grand jury minutes to identify that evidence.   [34–35]

Error was not shown at the trial of an indictment in the admission in evidence of a document on the ground that it was the "fruit" of an alleged "illegal seizure" of an executed copy of that document where

---

[1] Richard C. Simmers and Richard K. Gordon are the other defendants. George Lewis Brady (Brady), also named as a defendant in each indictment, was found by the judge to be incapable of standing trial with the defendants.

the admitted document was never the property of or taken from the defendant and there was no showing of an illegal seizure of the defendant's copy and there was abundant evidence from independent sources of the existence and content of the admitted document. [35]

Where a judge interviewed each prospective juror separately in open court prior to the commencement of a trial of indictments, inquired of each as to relevant matters embraced in G. L. c. 234, § 28, propounded some additional inquiries, and in all respects was meticulous to secure an unbiased jury, there was no abuse of discretion in the denial of a motion that defence counsel be permitted to interrogate the prospective jurors or that the judge propound questions prepared by counsel. [35–36]

There was no error in the denial of a request by defendants in a criminal case for permission to examine the testimony of a witness before the grand jury to determine whether his testimony there was consistent with his testimony at the trial. [36]

Knowledge of an unfaithful agent that a statement by which a confederate obtained money from the agent's principal was false was not to be imputed to the principal and did not preclude conviction of the confederate of obtaining money by false pretences. [47–48]

Conviction of a construction engineer engaged by the Massachusetts Parking Authority upon an indictment for larceny of its money was warranted where evidence at his trial supported findings that the defendant knowingly participated with others in a false statement, appearing in three of the Authority's documents, that a contractor constructing a garage for the Authority had, before the making of the construction contract, rendered certain "architectural and engineering services" for which the contract provided an immediate payment of a part of the contract price, that the defendant intended the Authority to rely on the statement, that the Authority in reliance on the statement issued a requisition to its "construction fund trustee" to make the payment to the contractor, that the trustee in reliance on the statement honored the requisition and made the payment, and that the contractor thereupon paid a purported "finder's fee" which in cash came into the possession of the defendant and a confederate. [46–47, 48]

Conviction of two defendants upon an indictment for larceny of money of the Massachusetts Parking Authority was warranted where evidence at their trial supported findings that after others, pursuant to a scheme to steal from the Authority, had brought about by false pretences an illicit payment of funds of the Authority to a construction contractor, the defendants by prearrangement and knowingly furthered the scheme by participating in causing the money paid to the contractor to be paid partly to themselves and partly to others in purported satisfaction of spurious claims against the contractor; it was without consequence that the defendants committed no overt act in the scheme until after the payment of funds to the contractor. [48–50]

In a prosecution for larceny, an averment and a showing that a possessory or other property interest in the thing stolen is in someone other than the thief and proof that he knew that he had no right to the property taken are sufficient under G. L. c. 278, § 9. [50]

Averments in indictments for larceny and for conspiracy to commit lar-
ceny and in accompanying bills of particulars that the money stolen
was the property of the Massachusetts Parking Authority were sus-
tained under G. L. c. 278, § 9, where it appeared that the Authority, in
connection with an issue of its revenue bonds for the construction of a
garage, created a construction fund to be held in trust by a bank and
applied only to payment of the cost of the project, that the Authority
had such control over the fund as to give it a special property interest
therein, and that the defendants by false pretences obtained money
from the fund.   [51]

On an indictment for larceny by false pretences under G. L. c. 266, § 30,
the defendant under c. 277, § 59, may be prosecuted "in any county
where the false pretence was made, written or used" by him even
though he never had possession in that county of the property alleged
to have been stolen; *Commonwealth* v. *Friedman,* 188 Mass. 308, over-
ruled.   [51–53]

A conclusion that the effective false pretence in obtaining money was
"made, written or used" in a Massachusetts county so that the crime
of larceny thereby was rightly prosecuted in that county under G. L.
c. 277, § 59, was warranted by the evidence notwithstanding certain
acts done elsewhere.   [54–55]

At the trial of an indictment for conspiracy to steal, evidence of the acts
and statements of three defendants was sufficient to connect each with
a combination to accomplish the common object of stealing money of
the Massachusetts Parking Authority and to warrant the conviction of
each defendant, even though two of them first participated in the con-
spiracy relatively late in its course.   [55]

A contention that the judge at the trial of an indictment for conspiracy
against three defendants prejudicially failed, when admitting evidence
of declarations of coconspirators in the absence of the defendants, to
give adequate instructions to the jury limiting the effect of the declara-
tions to the declarants was untenable where it appeared that early in
trial the judge, after extended discussion with counsel and upon a
representation by the prosecutor that evidence of the existence of the
conspiracy and of the participation of each defendant therein would
be produced, had adopted the procedure of admitting evidence of the
declarations against all the defendants, saving a "blanket exception"
by them to its admission and reserving to them the right to have it
struck out subsequently if the prosecutor's representation were not sub-
stantiated, and that the defendants had acquiesced in such procedure.
[56–58]

There was no error at the trial of an indictment for conspiracy in the
denial of a motion by a defendant to strike evidence as to declarations
made by alleged coconspirators in the defendant's absence in view of
evidence introduced sufficient to support findings that a conspiracy
existed and that such defendant had joined in it.   [58]

At the trial of an indictment for conspiracy to commit larceny, where
there was evidence of the existence of a conspiracy to obtain money by
false pretences and of the defendants' participation therein and that

money was so obtained, there was no error in admitting or in refusing to strike evidence that one who could have been found to have been in fact a coconspirator although not a defendant nor named in the indictment as a coconspirator had said in the absence of the defendants, when causing some of the money so obtained to be paid to a corporation controlled by two of the defendants, that such money was "going . . . to the Forty Thieves." [58–59]

INDICTMENTS found and returned on May 31, 1962.

The cases were tried in the Superior Court before *Quirico, J.*

*Manuel Katz* (*Daniel Klubock* with him) for Richard C. Simmers & another.

*John D. O'Reilly, Jr.* (*Matthew L. McGrath, Jr.*, with him) for Francis W. Kiernan.

*Gael Mahony,* Special Assistant Attorney General (*William B. Dockser,* Special Assistant Attorney General, with him), for the Commonwealth.

KIRK, J. The jury returned verdicts of guilty against the defendants on indictments 4018, charging them with larceny from the Massachusetts Parking Authority (Authority),[2] and 4020, charging them with conspiracy to commit larceny from the Authority.[3] In the latter indictment The Foundation Company and two individuals, later to be identified in this opinion, were named as coconspirators but were not named as defendants. The trial was subject to G. L. c. 278, §§ 33A–33G. The case comes to us upon appeals accompanied by twenty assignments of error by the defendants Richard C. Simmers (Simmers) and Richard K. Gordon (Gordon),[4] and twenty-two assignments by Francis W. Kiernan (Kiernan). We have a summary of the record and the transcript of evidence.

---

[2] The Authority was created "a body politic and corporate" by St. 1958, c. 606, § 3, for the purpose of constructing, operating, and maintaining "a garage for motor vehicles under Boston Common." St. 1958, c. 606, § 2 (e).

[3] At the close of the evidence the judge directed verdicts of not guilty on indictment 4022 charging Kiernan alone with extorting money from The Foundation Company, which contracted with the Authority to construct the garage, and on indictment 4021 charging all defendants with conspiracy to extort money from The Foundation Company.

[4] Simmers' and Gordon's assignments 2 and 18 were not argued and are therefore deemed waived. Rule 13 of the Rules for the Regulation of Practice before the Full Court (1952), as amended, 345 Mass. 787.

We first consider those assignments of error which do not require a detailed recital of the evidence for an under-standing of our disposition of them.

1. Without intimating that there is any merit to Kiernan's assignments 1, 2 and 3, relating to the overruling of his pleas in abatement and to the denial of his motion to quash, we do not take cognizance of them because they are not based upon exceptions seasonably saved. *Commonwealth* v. *Gray,* 314 Mass. 96, 102. *Commonwealth* v. *Crowell,* 347 Mass. 771. The rulings of the judge were entered on June 22 and 25, 1962. The required notices were then given to the parties. The claim of exceptions was filed on July 6, 1962. There was thus a failure to comply with Rule 72 of the Superior Court (1954).[5]

2. Simmers' and Gordon's assignment 1 and Kiernan's assignment 5 challenge the judge's denial of their motions seeking to invalidate the indictments on the ground that the grand jury were prejudiced by adverse publicity prior to the return of the indictments. The subject of the motions was fully considered by this court in *Commonwealth* v. *Geagan,* 339 Mass. 487, 498–501, and the issue was resolved adversely to the defendants. What was said there applies here. Further discussion is unnecessary. There was no error.

3. There was likewise no error in the denial of Kiernan's motions for further particulars (assignment 4). The essentials of both indictments and the bills of particulars relating to them are set out in the footnote.[6] The language of

[5] Rule 72 provides in part: "Exceptions to any other . . . ruling . . . made in the absence of counsel shall be taken by a writing filed with the clerk within three days after the receipt from the clerk of notice thereof."

[6] The larceny indictment alleged that the named defendants on March 2, 1960, "did steal money of the amount and of the value in all of four hundred fifty thousand dollars, of the property of the Massachusetts Parking Authority, a body politic and corporate." The Commonwealth's substitute bill of particulars, filed by leave of court after the denial of Kiernan's motion for further particulars, stated that the stealing was from "the Massachusetts Parking Authority Construction Fund Trustee Account in the custody of The First National Bank of Boston, at Boston, Suffolk County, Massachusetts," and that the manner and means were that the "defendant with intent to defraud obtained by false pretenses the making of a check and in consequence and by means thereof and as part of the same transaction by said false pre-

both indictments complies with G. L. c. 277, § 79. *Commonwealth* v. *Carver*, 224 Mass. 42. Each indictment, when read with the corresponding bill of particulars, gave Kiernan fully, plainly, substantially and formally, reasonable knowledge of the crimes with which he was charged. G. L. c. 277, § 40. *Commonwealth* v. *Welansky*, 316 Mass. 383, 395–396. *Commonwealth* v. *Iannello*, 344 Mass. 723, 725–726. He was not entitled to more. The Commonwealth is under no duty to provide a defendant with a summary of its evidence against him. *Commonwealth* v. *Lammi*, 310 Mass. 159, 160–162.

4. Kiernan's assignments 6 and 7 assert that it was error for the judge to deny a pre-trial motion to suppress evidence obtained as a result of an alleged illegal search and seizure and to examine the grand jury minutes to identify that evidence. A motion to suppress is properly made before trial. *Commonwealth* v. *Lewis*, 346 Mass. 373, 382. The judge, however, is not required to make, and in the nature of things cannot be required to make, a decision on such a motion, where, as here, the evidence sought to be suppressed is not identified by the moving party. Nor may he be required to permit counsel before trial to inspect the

tenses and with said fraudulent intent induced another to part with said check and with money; and thereby obtained said money; said false pretenses being false representations by word and act and by the making, execution and submission of false and fraudulent documents including contracts, bills, requisitions and statements for services and work never performed which were well known to be false and fraudulent by said defendant."

The conspiracy indictment alleged that the same defendants on December 2, 1958, "and on divers other days and times between that day and the day of the presenting. of this indictment [May 31, 1962], did conspire together and with The Foundation Company, a corporation duly existing under the laws of the State of New York, William F. Thompson and Maurice A. Broderick, to commit thereafter, from time to time and on different occasions as opportunity therefor should offer and not at times then particularly set and fixed, the crime of stealing money of an amount and value in excess of one hundred dollars, of the property of the Massachusetts Parking Authority, a body politic and corporate." The bill of particulars stated that the place of the conspiracy was "Boston, Suffolk County, Massachusetts, and each and every other place where the opportunity arose to conspire to commit the offense set forth in the indictment," and, as to the manner and means stated that "Each defendant assisted one or more of the other defendants in conspiring to commit the offense set forth in the indictment and more particularly by the certification of a false and fraudulent requisition by the defendant Kiernan and resulting in the stealing of money of an amount and value in excess of $100, the property of the Massachusetts Parking Authority."

minutes of the grand jury to ascertain what evidence the Commonwealth has and the means used to obtain it. *Commonwealth* v. *Galvin*, 323 Mass. 205, 211. The judge, however, in denying the pre-trial motion to suppress, expressly reserved Kiernan's right to renew the motion ''at an appropriate time before or during trial.'' Thereafter, during the trial, Kiernan excepted to the admission in evidence and to the refusal to strike from the record a resolution adopted by the Authority, authorizing and approving the execution of a contract with The Foundation Company for the construction of the garage under Boston Common (Kiernan's assignments 8 and 9). Annexed to the admitted resolution was a form of contract approved in writing by Kiernan. Both were admitted as a single exhibit (exhibit 7). Indisputably, no part of exhibit 7 was ever the property of Kiernan and was never taken from him. The contention by Kiernan, made before us for the first time, that the admitted document was the ''fruit'' of an alleged ''illegal seizure'' of an executed copy of the same contract is so farfetched as not to merit comment. Apart from the decisive fact that there was no showing of an illegal seizure of Kiernan's copy, there was, from independent sources, abundant evidence of the existence and content of the admitted document, executed by the Authority, so as to preclude the possibility of any prejudice to Kiernan from a prior examination, if any, of his executed copy by the prosecution. See *Fahy* v. *Connecticut*, 375 U. S. 85, 86–87.

5. Simmers and Gordon in their assignment 3 and Kiernan in his assignment 10 claim error in the judge's denial of their motions that defence counsel be permitted to interrogate prospective jurors, or in the alternative that the judge propound questions prepared by counsel, to determine if the jurors were impartial. It is clear from our decisions that the questioning of jurors, other than as required by G. L. c. 234, § 28, rests wholly in the discretion of the judge. *Commonwealth* v. *Taylor*, 327 Mass. 641, 646–647. *Commonwealth* v. *Bonomi*, 335 Mass. 327, 333–

335. *Commonwealth* v. *Greenberg,* 339 Mass. 557, 566. The judge in fact, however, interviewed each juror separately in open court, informed each of the essentials of the indictments, inquired of each as to the matters embraced in G. L. c. 234, § 28, so far as relevant, and in addition propounded, as the particular situation commended, additional inquiries, including some suggested by counsel. In all respects the judge was meticulous to insure the empanelling of a jury free from bias. See *Commonwealth* v. *Galvin,* 323 Mass. 205, 213; *Commonwealth* v. *Geagan,* 339 Mass. 487, 502–508. There was no error.

6. The judge was not in error in denying Simmers' and Gordon's request (assignment 7) that they be permitted to examine the testimony of a coconspirator before the grand jury to determine if his testimony there was consistent with his testimony at the trial. *Commonwealth* v. *Goldberg,* 212 Mass. 88, 90, 91–92. *Commonwealth* v. *Gettigan,* 252 Mass. 450, 464. We observe, however, that before acting on the request, the judge himself examined the grand jury transcript for this purpose and concluded that there was no inconsistency.

Consideration of the remaining assignments requires that we set out the inevitably extensive evidence produced at the lengthy trial disclosing a series of involved transactions and events and the substitution or replacement of participants as the alleged conspiracy developed. We preface the detailed narrative with a synopsis of what the evidence shows: a decision by Brady, the chairman of the Authority, to profit illicitly from the construction of the garage; a statement by Brady to the prospective contractor that it would not be awarded the construction contract unless there was coöperation in Brady's plan; the acquiescence or consent of the contractor to the unlawful purpose; the formulation over a period of months of a scheme whereby, upon the execution of the contract, $450,000 of construction funds, ostensibly but falsely in payment for obligations theretofore incurred by the contractor for services in preparation for the construction, would be paid to the contrac-

tor; the payment soon thereafter by the contractor of a total of $310,000 to the defendants under the guise of: (1) a finder's fee, (2) an attorney's fee, and (3) a subcontract for work on the garage, when in fact no services or work had been or were to be rendered or performed by the recipients of the money. The details follow.

By St. 1958, c. 606, the Authority was created as an independent body the essential functions of which were to build, operate and maintain a garage for motor vehicles under Boston Common. It was granted the general powers necessary to accomplish its purposes including the powers to "issue Common garage revenue bonds of the Authority," "make and enter into all contracts . . . necessary or incidental to the performance of its duties," and "employ consulting engineers." St. 1958, c. 606, § 5 (f), (l) and (m). Under § 8 of the act the Authority was authorized "to provide by resolution . . . for the issuance of Common garage revenue bonds of the Authority for the purpose of paying . . . the cost of the project," the proceeds of which "shall be used solely for the payment of the cost of the project, and shall be disbursed in such manner and under such restrictions, if any, as the Authority may provide in the resolution authorizing the issuance of such bonds or in the trust agreement hereinafter mentioned securing the same." The Authority could in its discretion, under § 9 of the act, secure the bonds by a trust agreement with a corporate trustee with such provisions "as the Authority may deem reasonable and proper for the security of the bondholders."

On December 4, 1958, pursuant to St. 1958, c. 606, § 3, Brady was appointed and confirmed as a member of the Authority.[7] He became chairman on May 28, 1959.[8] Just prior to June, 1959, Brady met William F. Thompson (Thompson), a coconspirator but not a defendant, who was chairman of the board of directors of The Foundation Com-

---

[7] The Authority consisted of three members, two appointed by the Governor and one by the mayor of the city of Boston.

[8] Brady continued as chairman until his resignation from the Authority on November 17, 1961.

pany (Foundation) located in New York, and told him
that, if Foundation was to get the contract for the construc-
tion of the garage, Foundation would have to pay $300,000
for it. He also said that he understood that Foundation
kept a box of cash for such purposes, which Thompson
denied. On June 3, 1959, there was a meeting in Boston
attended by Brady, Thompson, Chester W. Cambell (Cam-
bell),[9] president of Foundation, a representative of John
Nuveen & Company, Inc. (Nuveen), to be selected by the
Authority on June 8, 1959, to underwrite the bond issue,
and Maurice A. Broderick (Broderick), a coconspirator but
not a defendant. Broderick, Brady's brother-in-law, was
an attorney licensed to practise in New Hampshire. He
attended the meeting at Brady's request to learn what he
could about Brady obtaining a "finder's fee." Although
Broderick learned nothing about a fee for Brady at the
meeting, Thompson there told one Shea, a member of a New
York law firm representing Foundation, that he and Cam-
bell had agreed to retain Broderick as counsel for Founda-
tion in Massachusetts for $100,000 and to pay $150,000 as
a finder's fee to the party who had brought Brady and
Thompson together.

Brady, Thompson, and Cambell met in Boston on June
18, 1959. On that day, the Authority voted to accept a pro-
posal dated June 17, 1959, made by Foundation for the con-
tract to build the garage.

At Brady's request Broderick attended a meeting in New
York in August, 1959, to learn about Brady's chance of
receiving a "fee" of $405,000. Thompson and Shea were
present. It was suggested that the "fee" be paid to Brady
in three forms: (1) a "finder's fee" of $150,000, (2) an
"attorney's fee" of $100,000, and (3) a "subcontract" of
$155,000. In November, 1959, Broderick enlisted Edward
Plourde (Plourde), a friend for forty years, to act as a
straw for Brady in obtaining the "finder's fee." Plourde,
in fact, had nothing to do with getting the garage construc-
tion contract for Foundation.

---

[9] Cambell died before the trial.

On February 20, 1960, Brady and Broderick went to New York where they met Thompson, Cambell, and Gordon Morrison (Morrison),[10] the treasurer of Foundation. Thompson dictated three letters. Each letter was predated and signed by Cambell as president of Foundation. The first letter, predated to May 4, 1959, was addressed to Plourde and stated that if Foundation obtained "a contract for construction in the State of Massachusetts within a period terminating two years from [that] date, we agree to pay you . . . a fee equal to 2 per cent of the gross contract price . . . [but] if your fee should amount in total to more than $150,000 on any job, we will pay you upon our signing of the contract . . . $100,000 . . . and . . . the remainder of the fee to be paid you will be in proportion to the payments we receive from the owner." The second letter, predated to June 17, 1959, was addressed to Broderick and stated: "We will pay you [for legal services rendered and to be rendered for the garage and other projects] the sum of . . . [$50,000] upon receipt of our mobilization item. $15,000 60 days thereafter. The balance of $35,000, February 1, 1961." In fact, no legal services were to be rendered by Broderick. The third letter, predated to February 11, 1960, was addressed to the Granite State Realty and Construction Co., Inc. (Granite), a New Hampshire corporation with no assets, which had been formed in April, 1959, by Broderick who was its president, treasurer, clerk, and director. The letter stated that it was the intention of Foundation "to enter into a contract with . . . [Granite] upon our obtaining a contract with the Massachusetts Parking Authority to carry out the following work for us on our project, 'Underground Garage Located under Boston Common' as follows: 1. We will pay you to construct four construction buildings for the sum of $40,000. 2. . . . to construct certain fences . . . $25,000. 3. . . . to construct four kiosks . . . $40,000. 4. . . . for . . . construction equipment and [supplies] . . . $50,000." In fact, no

---

10 Morrison died before the trial.

construction work of any kind was done, and no materials or equipment were furnished by Granite to Foundation.

On February 23, 1960, three days after the letters just described were signed in New York, the Authority met in Boston, and, exercising the powers conferred upon it by St. 1958, c. 606, adopted a series of resolutions, all signed by Brady and the other two members of the Authority. One of these resolutions provided that the firm of Muzzillo and Tizian be designated construction engineer. Kiernan was a member of this firm and acted for it in all matters relating to the construction of the garage. Another resolution authorized and approved the contract with Foundation for the construction of the garage at the price of $7,500,000. The contract attached to this resolution bore, as required by the resolution, Kiernan's signature following the words "Within contract hereby approved, Muzzillo and Tizian." The contract provided, in part, as follows: "The Authority shall pay for . . . all work to be performed by contractor . . . the amount of $7,500,000, which sum shall be paid as follows: 6 per cent [i.e. $450,000] of the total of the above amount shall be paid to the contractor on the effective date of this contract *as payment for architectural and engineering services heretofore rendered by the contractor in connection with the project*" (emphasis supplied). Still another resolution, called the bond resolution, authorized the Authority to issue revenue bonds not exceeding $9,600,000 for the purpose of financing the project. This resolution created a special trust fund that was to be "deposited with and held by the Construction Fund Trustee" (Trustee), designated to be The First National Bank of Boston (First National), and to be "held in trust and applied only for the payment of the cost of the Project . . .." The Trustee, under this resolution, could make payments only upon the filing by the Authority of "(A) a requisition, signed by an authorized Officer of the Authority, stating in respect to each payment to be made: (1) the item number of the payment; (2) the name of the person to whom payment . . . [was] to be made; (3) the amount to be paid; (4) the pur-

pose, by general classification, for which the payment . . . [was] to be made; (5) that obligations in the stated amounts . ·. . [had] been incurred by the Authority, and *that each item thereof . . . [was] a proper charge against moneys in the Construction fund . . .*" and "(C) . . . *a certificate, signed by the Construction Engineer and attached to such requisition, certifying their approval thereof and further certifying that* each such obligation . . . [had] been properly incurred and . . . [was] due and unpaid and that, *insofar as such obligation was incurred for work . . . such work was actually performed . . . in furtherance of the construction of the Project . . . .* Upon receipt of each such requisition and all required accompanying certificates, the Construction Fund Trustee shall pay each such item from the Construction Fund directly to the person entitled thereto . . ." (emphasis supplied).

Finally, on the same day, the Authority formally resolved to accept Nuveen's bond purchase contract proposal which provided for simultaneous payment for and delivery of the bonds at Chemical Bank, New York Trust Company of New York City (Chemical Bank). This bond purchase contract, signed at the meeting by Brady, was expressly made subject to the condition that "[a]t the time of the closing, the Authority shall have entered into a legal and binding contract . . . for the construction of the Boston Common Garage . . . *which contract shall provide that the time of construction shall commence upon* the date of delivery of the bonds to . . . [Nuveen] and payment therefor and *the payment by the Authority to The Foundation Company of the initial payment for architectural and engineering services theretofore rendered . . .*" (emphasis supplied).[11]

The closing, i.e., the sale of the bonds, took place in New York on March 2, 1960. Present were Brady, Thompson, Cambell and others from the Authority and from Foundation, as well as Kiernan for Muzzillo and Tizian, Walter N. Burnett (Burnett), an officer of First National, and repre-

---

[11] This is the "mobilization item" mentioned in the fictitious contract for legal services prepared by Thompson on February 20, 1960.

sentatives from Nuveen and Chemical Bank. The construction contract between the Authority and Foundation was signed by Brady and Kiernan, among others. It contained the same provision as the contract originally authorized and approved in Boston by Brady and Kiernan, *"Six per cent [i.e. $450,000] of the total of the above amount [$7,500,000] shall be paid to the Contractor on the effective date of this contract as payment for architectural and engineering services heretofore rendered by the Contractor in connection with the Project"* (emphasis supplied). On the date of the closing costs of only $35,246.44 had in fact been allocated by Foundation to the garage project. Brady delivered to Nuveen $9,600,000 worth of Boston Common Garage revenue bonds for which Nuveen paid $9,330,200, giving to Brady a check payable to the Authority for $7,732,800[12] which Brady indorsed for the Authority and delivered to Burnett who, having accepted for First National the powers and duties of Trustee, deposited it in Chemical Bank in First National's account for the account of the Massachusetts Parking Authority Construction Fund (construction fund). Requisition 1, containing two items, namely, (1) $200,000 payable to the Commonwealth, and (2) $450,000 payable to Foundation, was taken by Burnett from Boston to New York, where it was signed by Brady and another member of the Authority. In New York the following specifications were added: as to item (1) "Reimbursement of Commonwealth pursuant to Section 18, Chapter 606 Mass. Acts of 1958,"[13] and as to item (2) *"Payment for architectural and engineering services as required by Construction Contract"* (emphasis supplied). Kiernan's certificate, approving the payments and certifying that the services had been "actually performed,"

[12] The difference between $9,330,200 and $7,732,800 is accounted for by First National's deposit of $1,597,400 in Chemical Bank, as Sinking Fund Trustee, from which fund interest on the bonds would be paid until the garage became operative at which time interest would be paid from the revenue received.

[13] This sum was appropriated "for the preliminary expenses of the Authority in carrying out the provisions of this act," and was to be repaid out of the proceeds and upon the delivery of the bonds.

was attached to the requisition. Later, on the same day, Burnett, to honor the requisitions, withdrew from the construction fund account $200,000 payable to the Commonwealth and $450,000 payable to Foundation. He presented a check for the latter amount to Cambell who immediately deposited it to Foundation's account in the Chase Manhattan Bank in New York. Accompanying this check was a letter from First National to Foundation stating that the check was "in payment on behalf of The Authority *for architectural and engineering services heretofore rendered by you in connection with the construction of the Boston Common Garage project*" (emphasis supplied).

We now turn to the sequence of events whereby funds were moved from Foundation's account to the defendants. They begin on March 2, 1960, the day of the closing. First, the finder's fee. Broderick and Plourde went to Foundation's office where they met Morrison and Thompson, who gave Plourde a check for $100,000 in accordance with the letter predated May 4, 1959. On March 3, 1960, Plourde deposited the check in an account in his name in the Manufacturers Trust Company (Manufacturers Trust) in New York.

Soon thereafter Broderick and Plourde met Kiernan and Brady in a New York hotel where Brady, in the presence of the others, told Plourde that the cash for the "finder's fee" was to be turned over by Plourde to Simmers.[14] Broderick and Plourde then met with Thompson, Morrison, and Cambell. Plourde received Foundation's check for $45,000 drawn on the Chase Manhattan Bank and signed by Thompson and Morrison. Thus Foundation completed its commitment under the fictitious finder's fee contract.[15] Plourde deposited the $45,000 check in his account at Manufacturers

---

[14] The rather abrupt appearance on the scene of Simmers, and shortly thereafter of Gordon and one Craven, as replacements for Broderick and Plourde, is in part probably accounted for by a dispute between Broderick and Brady about Plourde. Brady wanted the "finder's fee" to come to him from Plourde in cash, but Broderick did not wish to have Plourde left, as a result, with an income tax problem. Broderick also told Brady that the compensation which Brady proposed to give to Plourde for acting as a straw was too small.

[15] The difference between the price set in the "finder's fee" contract ($150,000) and the amount Plourde actually received ($145,000) is accounted for by a $5,000 "discount" for early payment.

Trust where he had previously deposited the $100,000 check, and then, upon Brady's direction, made out two checks, one for $95,000 and the other for $45,000, both payable to Simmers. Plourde retained $5,000 for his own services.

On April 1, 1960, Broderick, at Brady's request, sent Plourde to New York where he met Brady, Kiernan, Simmers, Gordon, and John J. Craven (Craven). Simmers and Gordon were law partners. Craven was a friend of Gordon and had come to New York on the representation that he was to act as a straw for Gordon in a "real estate transaction." Brady, Kiernan, and Plourde met Simmers, Gordon, and Craven at a New York restaurant where Kiernan destroyed the two checks which Plourde had made out to Simmers. All, except Brady, then proceeded to Manufacturers Trust where, pursuant to earlier instructions by Brady, Plourde drew a check for $140,000 payable to Craven who immediately presented it to the bank for payment. Simmers left to buy a brief case and returned. One hundred $1,000 bills and eighty $500 bills were produced by the bank and counted by Craven and Kiernan in the presence of Simmers, Gordon and Plourde in a small anteroom. Simmers placed the money in the brief case. Kiernan carried the brief case to a hotel where all once again met. There Brady and Kiernan counted the money and returned to Plourde the empty brief case. Gordon, later that day, gave Craven one of the $500 bills as payment for his assistance.

Second, the contract for legal services. On April 19, 1960, Broderick received from Foundation a check for $50,000, the first instalment under his fictitious contract for legal services set out in the letter predated June 17, 1959. In accordance with instructions from Brady, who told Broderick that Gordon was to take over the "attorney's contract," Broderick returned the check to Thompson with a letter, predated February 1, 1960, relinquishing his interest in that "contract" and assigning it to Gordon. Foundation, on April 26, 1960, sent three checks, totalling $100,000 and signed by Thompson and Morrison, to Gordon who acknowledged receipt of the checks in payment for services

purportedly to be rendered under the "attorney's contract." One of the checks (for $15,000) was cashed by Gordon. The other two (totalling $85,000) were deposited for collection. When they had cleared, Gordon, with Simmers, withdrew the $85,000 (five $10,000 bills and three hundred and fifty $100 bills); both counted it at the bank; Simmers put it in his pocket, and both left the bank. There was no evidence from any source that Broderick, Simmers or Gordon had rendered or expected to render any legal services to Foundation.

Third, the subcontract. On April 26, 1960, the same day that he assigned his "attorney's contract" to Gordon, Broderick also assigned in blank all his interest in Granite, resigned all his offices in it, and gave the corporate records to Brady. In due course Foundation issued a "purchase order" to Granite for the construction of four construction buildings for $40,000 in accordance with the fictitious subcontract embraced in the letter predated February 11, 1960. Pursuant to the purchase order, Morrison, on June 8, 1960, told the assistant treasurer of Foundation, one Liggett, to draw a check for $40,000 to Granite saying, "It is going on up there to the Forty Thieves." Thompson and Morrison signed the check, which was indorsed by Gordon as treasurer of Granite and was deposited in an account opened in the name of Granite on June 17, 1960, in a bank located in Andover. On August 1, 1960, Granite sent to Foundation a statement that there was due $25,000 for the construction of fences and $40,000 for the construction of four kiosks. Foundation sent a check for $25,000 to Granite on March 3, 1961, signed by Thompson and Morrison. This check was indorsed by Simmers and Gordon as officers of Granite and was deposited by them on April 20, 1961, in the Granite account.[16] The bank in Andover had also been used earlier by Gordon to deposit part of the "fee" for the "attorney's contract." Signature cards for the Granite account were

---

[16] There is no evidence that Foundation ever paid the $40,000 ostensibly due for the construction of the kiosks or the $50,000 ostensibly due for construction equipment and supplies.

signed by Simmers and Gordon as officers of the corpora-
tion. Simmers and Gordon withdrew over $45,000 of the
sum deposited. No work had been done by Granite under
the "subcontract."

The evidence shows no use or disposition of the funds
after they reached the defendants.

We resume our consideration of the assignments of error
and deal with them in the order which will best avoid repe-
tition of the evidence in the application of the law.

7. All of the defendants contend that the judge should
have directed verdicts for them on the larceny indictment,
and assign numerous grounds one of which is that the evi-
dence was insufficient to support verdicts of guilty (Kier-
nan's assignment 18, Simmers' and Gordon's 11). To con-
stitute the crime of larceny by false pretences "it must ap-
pear that there was a false statement of fact known or
believed by the defendant to be false, made with the intent
that the person to whom it was made should rely upon its
truth, and that such person did rely upon it as true and
parted with personal property as a result of such reliance."
*Commonwealth* v. *Green,* 326 Mass. 344, 347–348. *Common-
wealth* v. *Barrasso,* 342 Mass. 680, 683. *Commonwealth* v.
*Louis Constr. Co. Inc.* 343 Mass. 600, 604.

We deal first with Kiernan. The evidence shows not
only that there was a false pretence, but warrants a finding
that Kiernan knowingly participated in the making of it.
The statement, appearing in the construction contract, in
the bond purchase contract, and in requisition 1, that
$450,000 was due Foundation "for architectural and engi-
neering services" rendered before the construction contract
was executed, was a false statement. Only $35,246.44 had
in fact been expended by Foundation at the time of the
closing. That its falsity was known to Kiernan could be
inferred from several circumstances, weighed collectively,
among which are the following: The statement, apparently
the first in writing made or subscribed to by Kiernan in his
capacity as construction engineer, concerned a matter about
which he, under the bond resolution, was required to have

personal knowledge at the time the statement was made. It also related to a factual situation which could be readily verified by him. And yet, as construction engineer he had approved in writing in Boston on February 23, 1960, the contract containing the statement; in the same capacity he had certified in New York on March 2, 1960, for attachment to requisition 1, that the charge of $450,000 properly had been incurred and that the architectural and engineering services actually had been performed. The jury could find that his subsequent conduct was not reasonably reconcilable with innocent mistake or gullibility in making the statement. He was present shortly after March 2, 1960, when Brady told Plourde that the sum which was to come to Brady in cash for the "finder's fee" should go through Simmers; he later destroyed the two checks which Plourde had originally made payable to Simmers; he was present when the "finder's fee" was received from the straws; he carried the $140,000 in cash from the bank to the hotel; he, once with Craven, and once with Brady, counted the $140,000. The jury could conclude that the proximity in time between the filing of requisition 1 by the Authority and the payment by Foundation of $140,000 which, with Kiernan's help, reached Brady in cash, established a connection between the two events and reasonably foreclosed the hypothesis of Kiernan's innocence in the making of or subscribing to the statement which was false in fact.

The jury could reasonably infer from all the relevant circumstances that Kiernan knew and intended that the Authority in filing requisition 1 would rely upon the false statement in the contract and in his certificate and that First National upon presentation of the requisition would part with the money. *Commonwealth* v. *Iannello,* 344 Mass. 723, 736, and cases cited. The evidence shows that the Authority did file the requisition in reliance upon the false statement, which could be found to be a decisive or material influence in causing the Authority to direct First National to release the money. See *Commonwealth* v. *Morrison,* 252 Mass. 116, 125; *Commonwealth* v. *Jacobson,* 260 Mass. 311,

327.  That Brady, an agent of the Authority, also had knowledge of the falsity of the statement does not aid the defendants since the knowledge of a faithless agent will not be imputed to his principal in a case such as this one, because "[i]t would be absurd if the law should pronounce it impossible for an agent to deceive and defraud his principal . . ." by his own acts or by the acts of a confederate. *Commonwealth* v. *Mulrey,* 170 Mass. 103, 106.[17]  Nor does it help the defendants that, although the false statement was made to the Authority, it was First National that parted with the money.  See *Commonwealth* v. *Call,* 21 Pick. 515, 520.  All that is necessary to establish larceny by false pretences is proof that a "false statement . . . [was] made, with the intention to commit a fraud, and money or property . . . [was] thereby obtained." *Commonwealth* v. *Johnson,* 167 Ky. 727, 733.

The evidence thus supports Kiernan's conviction on the larceny indictment.  It points to his presence and collaboration in the main scheme of the larceny at the beginning, and points thereafter particularly to his active participation at each significant step in the process of collecting the fictitious finder's fee until it was reduced to his and Brady's possession.

8.  Although the evidence as to Simmers and Gordon discloses no overt act by them until after First National, relying upon the fraudulently induced requisition of the Authority, had transferred the $450,000 from the Authority's construction fund to Foundation, it shows that thereafter their roles, clearly inferable as being the result of careful prearrangement, were important in completing the larceny.

---

[17] There is no substance in the argument raised by Simmers' and Gordon's assignment 13 and Kiernan's assignment 19 that the judge, after charging the jury with respect to the law on the nonimputability of the guilty knowledge of an agent to his principal, erred by misleading the jury into thinking that the defendants had the burden of proving that the Authority did *not* rely upon the false statement.  The judge, at different times, correctly charged that the Commonwealth had the burden of proving every element of the crime including the element of reliance, and then, after instructing the jury on the "faithless servant rule," reiterated: "The burden is still on the Commonwealth to prove beyond a reasonable doubt that the Authority did rely upon [the false statement]."

Foundation, holding funds which rightfully belonged to the Authority, served as a cache and a colorably legitimate conduit for the distribution of the funds to the defendants behind the screen of the three sham claims. The parts played by Simmers and Gordon in getting the cash into their own hands under the spurious subcontract and attorney's fee, and in assisting in getting the cash into Brady's and Kiernan's hands under the guise of a finder's fee, constituted a series of steps toward the consummation of the crime of larceny in which the first step was the false pretence written in the resolutions and in the contract in Boston on February 23, 1960.

Simmers and Gordon have argued that the crime of obtaining money by false pretences was committed when First National transferred the $450,000 from the Authority's construction fund to Foundation. From a strictly technical point of view the argument has plausibility. We decline to rule, however, that in the circumstances disclosed the Commonwealth must be compelled to hinge the theory of its prosecution at that precise point in the sequence of events planned by the defendants, with the conceivable technical result that Simmers and Gordon could not be held as principals to the larceny. It is clear that the criminal design, from its inception, contemplated that the funds, through Foundation, should reach Brady's hands or the hands of persons designated by him, and that only when that result had been achieved would the enterprise, i.e., the larceny, be complete. And, indeed, it was only when that result was achieved that the essential larcenous nature, i.e., the animus furandi, of the plan became clear and demonstrable. Simmers and Gordon knowingly coöperated to advance the plan through that decisive stage. They accomplished with animus furandi the asportation of the funds both in New York and in Massachusetts. See *Commonwealth* v. *Rand*, 7 Met. 475, 477; *Commonwealth* v. *Parker*, 165 Mass. 526, 538–539. In so doing, they were acting in concert with others for a common purpose, to get money for their own benefit, and accordingly could be found guilty

of larceny of the money which was fraudulently obtained by means of a false representation. *Commonwealth* v. *Aronson,* 312 Mass. 347, 352, and cases cited. The situation here presented is not one where there is a succession of separate and distinct offences accomplished by one defendant acting as to each in concert with a different confederate with the result that the latter would not be guilty of offences committed prior to his participation. See, for example, *Commonwealth* v. *Greenberg,* 339 Mass. 557, 575–577. Rather we have here a single offence, accomplished in stages, in one or more of which Simmers and Gordon participated with felonious intent, and hence were guilty of the substantive crime charged. The Commonwealth's pleadings and evidence competently meet and encompass the offence as it was conceived and executed by the defendants.

9. Kiernan's assignments 18 and 20 and Simmers' and Gordon's 14, 15, and 17 are predicated upon the contention that the defendants were entitled to directed verdicts because the Commonwealth failed to show that the money allegedly stolen was the property of the Massachusetts Parking Authority as set out in the indictments and bills of particulars. This contention cannot prevail. General Laws c. 278, § 9, provides: "In the prosecution of crimes which relate to or affect . . . personal estate, *it shall be sufficient, and shall not be a variance, if it is proved on the trial that, at the time when the crime was committed, either the actual or constructive possession or the general or special property in* the whole or *any part of such* . . . *personal estate was in the person* or community *alleged to be the owner thereof*" (emphasis supplied). The purpose of this section is not to compel the Commonwealth to name correctly, at its peril, the true owner of the property allegedly stolen, but rather is to "avoid the effect of objections as to the allegation of ownership." *Commonwealth* v. *Norton,* 11 Allen, 110, 111. An averment and a showing that a possessory or other property interest in the thing stolen is in someone other than the thief and proof that the thief knew that he had no right to the property taken are sufficient.

Although First National and Chemical Bank had financial interests in the garage project which for present purposes we need not define, it is clear that the Authority had a special property, cognizable under the statute, in the construction fund from which the $450,000 was illicitly drawn and passed through Foundation, as a conduit, to the defendants. The following considerations lead to this conclusion. The sole purpose of the construction fund was to pay the cost of the project entrusted to the Authority. First National, the depository, could not release the funds except in strict compliance with the requirements laid down by the Authority in the bond resolution, quoted earlier in this opinion. These requirements included the presentation of properly executed requisitions which only the Authority had the right to submit. When a properly executed requisition was submitted to First National it was obliged to honor it. The Authority had the power, under the bond resolution, to remove First National as trustee for cause and to appoint a successor. The Authority had the right to determine when and in what amounts the money held by First National should be invested, and First National was required to keep the Authority informed at all times as to the details of all investments made for the credit of the construction fund. These elements of control constitute a special property in the Authority sufficient to sustain the allegation of ownership. See *Commonwealth* v. *Fitzgerald,* 164 Mass. 587; *Commonwealth* v. *McDonald,* 187 Mass. 581.

10. In further support of their assignments relating to the denial of their motions for directed verdicts on the larceny indictment, the defendants Simmers and Gordon contend that the venue of the offence does not lie in Suffolk County. They cite G. L. c. 277, § 58, which provides: "Larceny, whether at common law or as defined by section thirty of chapter two hundred and sixty-six,[18] may be prosecuted and punished in any county where the defendant had possession of the property alleged to have been stolen." They

---

[18] General Laws c. 266, § 30, provides in part: "Whoever steals, or with intent to defraud obtains by a false pretence . . . the property of another . . . shall be guilty of larceny . . . ."

argue that there was no evidence that any of the defendants had possession in Suffolk County of the property alleged to have been stolen, and contend that, in consequence, the venue is wrong. The Commonwealth, on the other hand, cites G. L. c. 277, § 59, which provides: "The crime of obtaining money . . . by a false pretence . . . may be alleged to have been committed, and may be prosecuted and punished, in any county where the false pretence was made, written or used . . . by the defendant." It contends that if it has proved that a false pretence was made, written or used by the defendants in Suffolk County, the venue is proper. If this were a case of first impression we should have no hesitation in reaching the conclusion that by the plain terms of G. L. c. 277, § 59, the Commonwealth's contention is correct. We are confronted, however, with *Commonwealth* v. *Friedman*, 188 Mass. 308, where the court in a short opinion construing the predecessor statutes of G. L. c. 277, § 58 (R. L. c. 218, § 47), G. L. c. 277, § 59 (R. L. c. 218, § 48), and G. L. c. 266, § 30 (R. L. c. 208, § 26), held that on an indictment charging larceny, where the proof was that the larceny was effected by a false pretence, the prosecution could be had only in a county in which the defendant had possession of the property alleged to have been stolen.

The Commonwealth has argued the point exhaustively and asks us to reconsider the *Friedman* case. A discussion of each of the several persuasive arguments which the Commonwealth has marshalled in support of its contention that the *Friedman* case is wrong would unduly prolong this opinion. We think it is sufficient to point out that there was, in our judgment, a fundamental misconception in the *Friedman* case which led to an erroneous result. In the *Friedman* case, as in the case before us, the indictment was brought under the general larceny statute (R. L. c. 208, § 26), now G. L. c. 266, § 30. The court held, however, that the only venue statute which was applicable to the general larceny statute was the limited venue statute (R. L. c. 218, § 47), now G. L. c. 277, § 58, which requires a showing that the defendant had possession of the stolen property in the

county where he is being prosecuted. The court expressly excluded the applicability of the broad venue statute (R. L. c. 218, § 48), now G. L. c. 277, § 59, quoted in the preceding paragraph of this opinion. The fact is, however, that the "crime of obtaining money . . . by a false pretence" was, at the time the *Friedman* case was decided, defined only in the general larceny statute (R. L. c. 208, § 26), now G. L. c. 266, § 30. If, therefore, the broad venue statute (R. L. c. 218, § 48) was to have any meaning at all, it must have been the intention of the Legislature that it apply to the statute which alone defined the crime of obtaining money by a false pretence, namely, R. L. c. 208, § 26 (now G. L. c. 266, § 30).[19] We so hold. *Commonwealth* v. *Friedman,* 188 Mass. 308, may be considered overruled. The legislative history of the general larceny statute and the related venue statutes tends to confirm our conclusion and is set out in the footnote.[20]

---

[19] We do not overlook the fact that R. L. c. 208, § 27 (now G. L. c. 266, § 31), defining the crime of false pretences by the fraudulent obtaining of "the signature of a person to a written instrument," was also extant at the time of the *Friedman* decision. That statute, however, was expressly made subject to the provisions of R. L. c. 218, § 48 (now G. L. c. 277, § 59).

[20] The crimes presently included under the general larceny statute were originally defined by separate statutes, i.e., simple larceny (Pub. Sts. c. 203, § 20), embezzlement (Pub. Sts. c. 203, § 37), and false pretences (Pub. Sts. c. 203, § 59). Correspondingly, there were, except for simple larceny, separate venue statutes applicable to each crime, i.e., embezzlement (Pub. Sts. c. 213, § 20), and false pretences (Pub. Sts. c. 213, § 21). The latter statute provided that: "The offence described in section fifty-nine of chapter two hundred and three may be alleged to have been committed, and may be prosecuted and punished, in any county in which the false pretence or the privy or false token was made, written, or used . . . ." The three crimes were subsequently consolidated under a general larceny statute (R. L. c. 208, § 26). Accordingly, Pub. Sts. c. 213, § 20, was amended by R. L. c. 218, § 47, to include a general venue provision for all three crimes under the consolidated larceny statute, instead of providing only for venue under the crime of embezzlement. This amended section has remained unchanged and is now G. L. c. 277, § 58. On the other hand, the venue statute relating to false pretences (Pub. Sts. c. 213, § 21), although slightly amended when the consolidated larceny statute was passed (R. L. c. 218, § 48), remained substantially the same. It has not been amended since 1902 and is now G. L. c. 277, § 59. By not repealing this broad venue section after having enacted, in effect, a limited venue statute to govern the new consolidated larceny statute, the Legislature manifested an intent to have R. L. c. 218, § 48 (now G. L. c. 277, § 59), continue to govern the crime of larceny by false pretences even though that crime had been brought under the consolidated larceny statute.

We perceive no inconsistency or contradiction in having more than one venue statute applicable to a general larceny statute. General Laws c. 277, § 58, fixes a common basis (the possession of stolen goods) for the venue of crimes indictable under G. L. c. 266, § 30. The provision for a common basis does not, in our judgment, preclude the application of other bases which are specifically designed to facilitate the prosecution of a particular offence, such as the one before us which, although embraced within the general larceny statute, is commonly accomplished by an elusive modus operandi. "Larceny, as defined by our statutes, includes the obtaining of personal property by criminal, false pretences." *Commonwealth* v. *Carver*, 224 Mass. 42, 44-45.

11. The evidence was sufficient to show that a false pretence was "made, written or used" in Suffolk County, as required by G. L. c. 277, § 59. While it is true that the three predated letters which ostensibly were for the finder's fee, the attorney's fee and the Granite subcontract were written in New York on February 20, 1960, these were merely devices to shift the money, according to plan, to the defendants through Foundation as a conduit. The effective false representations were made or written in Boston. The series of resolutions adopted by the Authority on February 23, 1960, were written and signed in Boston. Brady's signature was on all of the resolutions. In Boston Kiernan, over his signature, approved the contract annexed to the resolution designating Foundation as the contractor for the garage. In Boston Brady signed the bond purchase contract with Nuveen. These instruments provided for the payment by the Authority to Foundation for "architectural and engineering services . . . [theretofore or heretofore] rendered" by Foundation. On the evidence the jury, as already indicated, unquestionably could find that the statements (that architectural and engineering services had been rendered to Foundation) when written in Boston were false, and known by Brady and Kiernan to be false. The documents which were signed in New York contained the

same false representation as the documents signed in Boston, were based upon the latter, and were "equally false and aimed at the same result." *People ex rel. Phelps* v. *Court of Oyer & Terminer County of N. Y.* 83 N. Y. 436, 453. *Commonwealth* v. *Iannello,* 344 Mass. 723, 737, and cases cited.

12. We turn to the conspiracy indictment and consider first the assignments relating to the denial of the defendants' motions for directed verdicts (Kiernan's assignment 18 and Simmers' and Gordon's assignment 12). The settled principles which are determinative of conspiracy as a common law crime are set out in the cases cited and discussed in *Commonwealth* v. *Beal,* 314 Mass. 210, 221-222, and need not be repeated. Contrary to the contention of the defendants that the evidence was insufficient to convict, there was ample evidence, already recounted, that there was "a combination of two or more persons [who], by some concerted action, [sought] to accomplish some criminal or unlawful purpose . . . ." *Commonwealth* v. *Hunt,* 4 Met. 111, 123. See *Attorney Gen.* v. *Tufts,* 239 Mass. 458, 493. Each defendant knew or communicated with other coconspirators, all of whose efforts were directed to the common object of stealing money from the Authority. *Commonwealth* v. *Smith,* 163 Mass. 411, 417–418. Simmers' and Gordon's participation, though relatively late, was during the course of the conspiracy and in furtherance of its purpose, and made them parties to it. *Commonwealth* v. *Corcoran,* 252 Mass. 465, 487. *Commonwealth* v. *Beal,* 314 Mass. 210, 221–222. See *Attorney Gen.* v. *Tufts,* 239 Mass. 458, 493–494. In short the acts and statements of each of the defendants were sufficient to connect each with the conspiracy so that the acts and declarations of all the coconspirators in pursuance of the common design, whether in their presence or absence, were admissible against them, and in their total force warranted verdicts of guilty on the conspiracy indictment. *Commonwealth* v. *Benesch,* 290 Mass. 125. "[C]onspiracies involving such elaborate arrangements generally are not born fullgrown. Rather they mature by successive

stages which are necessary to bring in the essential parties. And not all of those joining in the earlier ones make known their participation to others later coming in. . . . Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity.'' *Blumenthal* v. *United States,* 332 U. S. 539, 556–557. See *United States* v. *Stromberg,* 268 F. 2d 256, 266 (2d Cir.).[21]

13. Simmers and Gordon in assignments 4, 5, 6, and 19 and Kiernan in assignments 11, 12, 13, 14, and 15 contend that the judge, in admitting testimony of declarations of a conspirator in the absence of a defendant, failed to give adequate instructions, at the time the testimony was admitted, limiting the effect of the declaration to the declarant. There are several reasons which make this contention untenable as applied to the case before us. For one, the briefs of the defendants point to no instance where, upon the admission of the evidence, the judge, when requested and where it was proper to do so, failed to give an appropriate instruction to the jury limiting the effect of the evidence. Further, our examination of the transcript reveals that counsels' requests for instructions of the type indicated were made almost exclusively on the first day of the trial, which was mainly devoted to the introduction of

---

[21] The defendants in their briefs have quoted from opinions of the Supreme Court of the United States in which some of the justices inveigh against the practice of Federal prosecutors initiating conspiracy prosecutions in cases where the substantive crimes could readily be proved without an indictment for conspiracy, and point out the risks of convicting the innocent. *Krulewitch* v. *United States,* 336 U. S. 440. *Lutwak* v. *United States,* 344 U. S. 604. The quoted language has no relevance to the case before us.

documentary evidence. It appears also that on the second day of the trial when Broderick, the first of the coconspirators to take the stand, began his testimony, the judge initiated a conference with counsel concerning the manner in which the conspiracy case would be tried. The judge indicated a proper concern that with several alleged conspirators there was the danger, despite instructions limiting the effect of testimony, that the jury might unwittingly carry over the testimony of one or more witnesses to affect a defendant as to whom it was excluded and thus result in his conviction when his guilt might otherwise not be established in the minds of the jury. See *Blumenthal* v. *United States,* 332 U. S. 539, 559–560. After extended discussion, and upon the formal and unequivocal representation by the prosecutor to the judge that the Commonwealth would produce evidence which would warrant the jury in finding that a conspiracy did exist and that each of the defendants became parties to the conspiracy, the judge ruled that he would admit the testimony of the coconspirators against all of the defendants unless he otherwise indicated, that the defendants could now make a "blanket objection" to the testimony, and that he would save their "blanket exception" to its admission. He likewise reserved the defendants' right to strike the testimony if the evidence fell short of the representations made by the prosecutor, whose opening statement to the jury had outlined fully the nature and scope of the evidence which would be forthcoming in support of the indictments. The procedure adopted by the judge, although a modification of the procedure commonly followed in the trial of conspiracy cases,[22] was but an application of a trial practice permissible under our decisions.

---

[22] In *Commonwealth* v. *Benesch,* 290 Mass. 125, 132–133, Qua, J., said, "the manner in which conspiracy cases are customarily tried [is] by allowing in the first instance as against each defendant separately evidence of such acts, knowledge and admissions as appear to affect the particular defendant and then, when sufficient evidence has accumulated to support a fair inference of the existence of a conspiracy, by removing the limitation, so that evidence of the acts, knowledge and admissions of all who are found to have joined in the conspiracy, during the course of and in pursuance of the conspiracy, becomes applicable against all the conspirators."

*Commonwealth* v. *Dyer,* 243 Mass. 472, 507, citing *Attorney Gen.* v. *Pelletier,* 240 Mass. 264, 312–314.

Finally, the defendants took no exception to the procedure adopted by the judge. On the contrary, the whole tenor of the transcript bespeaks their acquiescence in it. Of the hundreds of exceptions saved to the overruling of objections to questions asked of witnesses, none was based on the procedure which was being followed or on the ground that limiting instructions were not given. The defendants having assented to the adoption of a recognized procedure cannot now be heard to complain. See *Dalton* v. *Post Publishing Co.* 328 Mass. 595, 598–599. In contemplation of the setting in which the trial was conducted no duty devolved upon the judge in the absence of a request to give repetitious instructions limiting the effect of particular bits of testimony. No error has been shown.

14. Cognate to the point just discussed was the denial by the judge of Kiernan's motions to strike the testimony of witnesses as to declarations of alleged coconspirators in Kiernan's absence (Kiernan's assignment 22). The denial of the motions imported a finding by the judge that the Commonwealth had fulfilled its promise as to the proof which would be produced to support the indictments and was implicitly a ruling by the judge that (a) sufficient evidence had been adduced to support a fair inference that a conspiracy existed; and (b) the state of the evidence was such that the jury could find that each of the defendants had joined in the conspiracy with the result that evidence of the acts, knowledge and admissions of all who were found to have joined in the conspiracy became evidence against all of the defendants. *Commonwealth* v. *Benesch,* 290 Mass. 125, 132–133. There was no error.

15. Simmers' and Gordon's assignment 10 and Kiernan's assignment 21 assert that it was error for the judge to refuse to strike Liggett's testimony that Morrison, when directing him to draw the $40,000 check payable to Granite, said that it was "going on up there to the Forty Thieves." Although Morrison was not named in the indictment as co-

conspirator, there was evidence warranting a finding that at the time he made the statement he was himself a coconspirator. He had been present when Thompson dictated and Cambell signed the predated letters for the finder's fee, the attorney's fee and the subcontract with Granite. He was a cosigner for Foundation of the several checks which at the time he made the statement had been issued in payment of these spurious undertakings. Chronologically, he made the statement when the conspiracy was approaching but had not reached its full fruition, after the finder's fee and the attorney's fee had already been paid over his signature. The statement was therefore a declaration of a coconspirator made in connection with an act done in the course of and in furtherance of the conspiracy, as well as an admission of his awareness of the criminal nature of the transaction, and was admissible against all who were his coconspirators. *Commonwealth* v. *Riches,* 219 Mass. 433, 438–439. That Morrison was not named in the indictment does not affect the competency of the testimony. *Commonwealth* v. *Scott,* 123 Mass. 222, 228, 236. *Commonwealth* v. *Galvin,* 310 Mass. 733, 746–747. Nor does the fact that the statement was metaphorically phrased affect its admissibility. It follows that there was no abuse of discretion in admitting the testimony, denying the motions to strike and denying the motions for a mistrial.

16. All of the assignments of error have been considered. Those not discussed are without merit. The charge of the judge, to which some of the undiscussed assignments pertain, was clear and complete, and, as to matters assigned as error, essentially correct.

17. The judgments against each defendant on each indictment are affirmed.

*So ordered.*